THE STATE v. L. C. STALLINGS, Appellant.—33 S. W. (2d) 914.

Division Two, December 20, 1930.

1038

*Abbington & Abbington, R. L. Dearmont* and *A. M. Spradling* for appellant.

*Stratton Shartel*, Attorney-General, and *G. C. Weatherby*, Assistant Attorney-General, for respondent.

BLAIR, P. J.—Defendant was charged by indictment with and tried for the crime of murder in the first degree for killing Bertha Stallings. He was found guilty of murder in the second degree and his punishment was fixed by the jury at imprisonment in the penitentiary for a term of fourteen years. From the judgment upon such verdict, he was granted an appeal.

It is not contended that the evidence was insufficient to authorize a verdict of guilt on defendant's part of a criminal homicide. The evidence was unusually conflicting concerning what actually transpired immediately before and during the shooting and killing. For a preliminary understanding of the case, the statement of facts made by the learned Attorney-General will suffice. We quote from and adopt the same, as follows:

"The State's evidence established that on the night of September 14, 1929, a public dance was being held at what was known as the 'Hiawatha Dance Hall,' a short distance south of Cape Girardeau. Bertha Stallings, the deceased, attended the dance, going there in company with Mr. and Mrs. Jerry Hagan and Mrs. Buckner, and arriving at about —— o'clock. The defendant was there when these parties arrived.

"Very shortly thereafter while Hagan and the deceased were dancing, the defendant stepped up to Hagan and called him s— o—

a—b, at the same time saying to the deceased that she didn't have to dance with Hagan, and reaching in his pocket with his right hand. Hagan struck defendant with his fist, knocking him back some three or four feet and partly down, that is, so that he was resting on his left hand or elbow on the floor. While rising from this position defendant drew a pistol and fired two or three shots at Hagan, and then stepped to deceased, took her by the left hand and fired a bullet into the left side of her chest. She fell to the floor. Several of the State's witnesses testified that he stood over her after she fell, the gun pointed toward her and fired another shot, although there is little in the evidence to show that any other shot, if fired, took effect, because one entering bullet wound was all that was found from an axamination of the body. Another wound was found, but it was described as an exit wound.

"At this point a number of men gathered around the defendant and took the gun away from him.

"The deceased was taken to a hospital, but died before any attention could be given to her. The evidence showed she died from a gunshot wound, and that the pistol the defendant shot her with was a .25 automatic.

"Many times in the State's evidence the deceased was referred to as Mrs. Stallings and also as the defendant's wife. However, at that time she was not his wife, having been divorced from him sometime prior to the shooting.

"The State's testimony varies as to the number of shots fired. Some of the witnesses believed there were as many as six. Others said three, and others five. The pistol in question could be loaded with seven cartridges, that is, six in the magazine and one in the gun barrel. The State's evidence further showed that the dance hall was a very large one and from 150 to 200 people were in attendance at the dance and present at the time of the shooting.

"The defense in the case was that the shots fired by the defendant were fired at Hagan in self-defense; that the shot that struck the deceased was wholly accidental; that the defendant had no thought or intention of killing or attempting to kill the deceased, but that Hagan, who was a large man, over six feet in height, weighing 225 or 230 pounds, attacked the defendant without cause or excuse, knocking him down twice, by striking him in the face with his fists; that defendant was in fear of death or further bodily harm and fired the shots for his own protection.

"To substantiate this defense and in his own behalf the defendant testified that he arrived at the dance about eight o'clock, going there directly from Harrig. Mrs. Stallings arrived about thirty minutes after him. He asked her to dance with him, but she refused. Jerry Hagan was standing at her right side at the time. Without any words being passed between him and Hagan, the latter struck him

in the right eye and knocked him down. He tried to get up when Hagan struck him again cutting a gash on his cheek. He thought Hagan had a knife in his hand because of the cut he received from the blow.

"On redirect examination, the defendant related what occurred at the time in these words:

"'Mr. Hagan and my wife were up here drinking soda and they were standing over here and I came along here and the music started and he taken her by the hand and started down there; I started across here to get one of these ladies for a partner and when I got here, he jumped right in front of me and hauled off and hit me.' That was the first starting of it and the way it happened.'

"Defendant further testified that the blows received dazed him and that he drew the gun and fired in the belief that he was in imminent danger of death or great bodily harm. That his only purpose in firing shots was to prevent further injury to himself and that he fired no shot at anyone except at Hagan; that he had no thought or intention of shooting his wife; that he was a man weighing about 124 pounds and had been sick for several months immediately prior to this shooting; that Hagan was a man weighing around 220 or 230 pounds. When interrogated about how he came to have a pistol with him he explained it by saying that he drove to his farm frequently and had been carrying this pistol in his car. That when he arrived at the dance and parked his car, he was afraid someone would steal the pistol and he put it in his pants pocket and took it with him to prevent its being stolen. He testified that he had but a slight acquaintance with Hagan prior to this time, and knew no reason why Hagan should hold any enmity toward him. He said he did not know that he had shot his wife until he had been removed from the dance floor to Dr. Chostner's office.

"Dr. Chostner was called as a defense witness and testified that when the defendant was brought to his office he had three wounds in the frontal, one small wound above the left eye, one above the bridge of the nose between the eyes, and a wound below each eye on the cheek; that his face was badly swollen and the wounds indicated they were made by a blunt instrument; his eyes were closed.

"The testimony further showed that after the shooting he was struck once by a gun in the hands of the constable, and once with a soda bottle in the hands of some other person, while they were in the act of removing him from the dance hall.

"Several witnesses were introduced by the defense whose testimony corroborated the defendant's as to the way the trouble started, and that while the defendant was shooting at Hagan the deceased apparently stepped between Hagan and the defendant."

The State's theory is that defendant armed himself and went to the dance and deliberately brought on the difficulty with Hagan by

calling him a vile name and reaching in his pocket as if to draw a weapon; that he drew his pistol and fired at Hagan immediately after Hagan knocked him down, that is to say, that Hagan struck and knocked defendant down in resisting an apparent assault by defendant; that after shooting at Hagan two or three times the defendant seized his former wife and deliberately fired one or more shots at her, at least one of which shots struck her and inflicted the mortal wound of which she died within a few moments. The evidence offered by the State, although quite conflicting in some of its important details, clearly justified submission of the case to the jury upon the charge of murder in the first degree.

On the other hand, there was evidence, mostly offered by defendant, which tended to show that defendant did not come to the dance armed for trouble, but that he merely carried his pistol with him into the dance hall to prevent its theft; that defendant did not start the trouble with Hagan, but, on the contrary, Hagan made an unprovoked assault upon defendant and knocked him down once and possibly twice and was advancing upon defendant threatening a further assault when defendant fired at him in self-defense and that defendant unintentionally shot Mrs. Stallings. Such evidence fully authorized an instruction telling the jury that, if defendant shot at Hagan in self-defense, and unintentionally shot and killed Mrs. Stallings, it should find defendant not guilty. [30 C. J. 88, sec. 271; 13 R. C. L. 746, sec. 50.]

We quote from Ruling Case Law, cited above, as follows:

"If the killing of the person intended to be hit would, under all the circumstances, have been excusable or justifiable on the theory of self-defense, then the unintended killing of a bystander by a random shot fired in the proper and prudent exercise of such self-defense i also excusable or justifiable. And if the killing of the intended victim would have been reduced by the circumstances to murder in the second degree or third degree, or to manslaughter in any of the degrees, then the unintended and accidental killing of the bystander resulting from any act designed to take effect upon the intended victim would be likewise reduced to the same grade of offense as would have followed the death of the victim intended to be killed."

This excerpt well states the law of this case if Mrs. Stallings was accidentally struck by shots fired by defendant and directed by him at Hagan. If defendant unintentionally shot and killed deceased in the lawful exercise of his right of self-defense against Hagan, his act in killing her must be measured by his justification, if any, in shooting at Hagan. On the other hand, if defendant was not justified in shooting Hagan on the ground of self-defense and in so shooting at him unintentionally shot and killed Mrs. Stallings, then his guilt in killing her must be measured and the degree of the homicide determined by what his crime would have been had he shot and killed Hagan. This

rule, however, would not apply if, as the testimony of witnesses offered by the State tended to show, defendant intentionally shot Mrs. Stallings.

If, under the evidence here, defendant would have been entitled to an instruction upon manslaughter had he shot and killed Hagan, he was clearly entitled to such an instruction on his trial for killing Mrs. Stallings, if he unintentionally shot her while shooting at Hagan under such circumstances. The trial court not only failed to give an instruction on manslaughter of its own motion, but refused defendant's request for such an instruction.

Defendant was entitled to have the jury instructed upon any theory of the case which his evidence tended to establish. His testimony was (and he was substantially corroborated therein by other witnesses) that Hagan made an unprovoked assault upon him and knocked him down twice. Such an attack might well arouse passion in one attacked and temporarily render him incapable of rational action. It is true that defendant characterized his act of shooting at Hagan as one done in self-defense. But the jury had the right from all the facts and circumstances to conclude that, while the shooting at Hagan by defendant was not justifiable on the ground of self-defense, the assault made by Hagan upon defendant was one calculated to and which did arouse his passion to such a degree as to deprive him of self-control so that his act in shooting at Hagan, while intentional, was done without malice aforethought, premeditation or deliberation and characterized his crime as manslaughter (Sec. 3236, R. S. 1919), had he succeeded in killing Hagan. Under such circumstances defendant would have been guilty of no greater crime in killing Mrs. Stallings, if he had no intention of shooting her when he shot at Hagan.

We think defendant was clearly entitled to an instruction on manslaughter. It was a question for the jury whether the unprovoked assault claimed by defendant to have been made upon him by Hagan was of such character as to arouse in defendant an uncontrollable passion so as to reduce the homicide from murder to manslaughter. The general rule is clearly stated in State v. Heath, 221 Mo. 565, l. c. 584, 121 S. W. 149, as follows:

". . . where the provocation consists of an assault or personal violence sufficient to arouse the heat of passion necessary to reduce the offense to the grade of manslaughter, the issue upon that grade of the offense should be submitted to the jury. The question as to whether or not an assault or personal violence did in fact arouse the heat of passion necessary to reduce the offense to the grade of manslaughter, is a question to be determined by the jury from all the facts in the case, and it is the duty of the court, under such state of facts, to submit that question to the jury." [See also State v. Wilson, 242 Mo. 481, 147 S. W. 98; State v. Darling, 199 Mo. 168; State v. Carey,

313 Mo. 436, 1. c. 446, 282 S. W. 22; State v. Harp, 306 Mo. 428, 267 S. W. 845; State v. Rennison, 306 Mo. 473, 1. c. 482, 267 S. W. 850.]

The State cites State v. Lloyd (Mo. Sup.), 263 S. W. 212; State v. Boston (Mo. Sup.), 256 S. W. 744, and State v. Kilgore, 70 Mo. 546, in support of its contention that the killing in the case at bar was murder under the State's evidence or self-defense under the defendant's evidence, and, hence, that there was no occasion for an instruction on manslaughter. In none of the cases cited did the killing occur, as here, in the progress of a personal assault and physical encounter.

As the case must be retried, there are other assignments of error which should be briefly noticed. We think the evidence of general threats made by defendant against persons, including his wife, was ▆▆▆▆▆ admissible, notwithstanding such threats were not made immediately prior to or soon before the killing. Such remoteness affected the weight and value of the testimony concerning such threats, but did not destroy its relevance or materiality. The cases cited by the State so hold. [State v. Adams, 76 Mo. 355; State v. Grant, 79 Mo. 113, 1. c. 137; State v. Glahn, 97 Mo. 679, 1. c. 689, 11 S. W. 266.]

We think the statements made by witnesses Thompson and Scheible were not properly admitted in evidence. Those statements were neither original evidence nor proper rebuttal. While they were offered to show that those witnesses had made prior ▆▆▆▆▆ contradictory statements, the witnesses were not specifically questioned concerning such prior statements and, hence, no proper foundation was laid for admission of their *ex parte* statements to impeach them.

. The State seemingly misconceives Littig v. Heating Company, 292 Mo. 226, 237 S. W. 779. We do not understand that case to hold that a witness need not be asked specifically about supposed prior contradictory statements before he can be impeached by the introduction in evidence of proof of such contradictory statements. In any event, the severity of the rule claimed to have been announced in the Littig case has been greatly modified by our decision in Peppers v. St. Louis-San Francisco Ry. Co., 316 Mo. 1104, 295 S. W. 757.

Before a witness may be impeached by proof of prior contradictory statements, a proper foundation for such impeaching testimony must be laid by asking such witness whether or not he made the alleged contradictory statements. We think this same rule made incompetent the testimony concerning statements made by witness Young as to his presence in Illinois on the night of the homicide. The fact that the testimony of said witness, taken on defendant's application for bail, was read in evidence as his testimony at the trial and the State had no opportunity to ask him if he had not told the impeaching witnesses he was in Illinois at the time of the homicide presents possible

hardship, but should not change the rule. It would, of course, have been proper for the State in rebuttal to have proven by competent testimony that Young actually was in Illinois at the time, so the jury could have found that he was not present at the dance and did not see the things about which he testified. But testimony concerning his mere statements as to his whereabouts at that time was not competent until the proper foundation had been laid for it.

It would have been better to have negatived the plea of self-defense in instructions 1 and 5. The requirement in Instruction 5 that the jury should find that defendant "wilfully, premeditatedly and with malice aforethought" shot deceased before it could find defendant guilty of murder in the second degree and, if it did not so find, to acquit defendant, possibly was sufficient, because the jury could not have found that defendant wilfully, premeditatedly and with malice aforethought shot deceased, if he fired the shot in self-defense. But, on another trial, the jury should be also required to find that the shot was not fired in self-defense, as defined in another instruction. This is also true of Instruction 1 on first degree murder, although defendant was not convicted of murder in that degree.

We think Instruction A was properly refused. The subject of self-defense was fully covered by Instruction 6, given by the court. Instruction A was also properly refused, we think, because it was a comment on the evidence.

We deem it unnecessary to enter into a consideration of the propriety of overruling defendant's challenges to jurors Ludwig and Bowers. Such alleged error is not one likely to occur upon another trial. We cannot refrain from saying, however, that there are plenty of qualified jurors available for the trial of a case like this without the necessity of forcing a prospective juror to say that he will be able to decide the case solely and alone upon the testimony adduced at the trial, in spite of a fixed and decided prejudgment on his part of the guilt or innocence of the accused, based upon newspaper accounts of the tragedy or conversations with other persons who claim to know the facts.

For the errors indicated, the judgment is reversed and the case remanded for another trial. All concur.