THE STATE v. O. C. FIELDER, Appellant.—50 S. W. (2d) 1031.

Division Two, June 10, 1932.

*Stratton Shartel*, Attorney-General, and *Edward G. Robison*, Assistant Attorney-General, for respondent.

COOLEY, C.—Defendant was charged by indictment in the Circuit Court of the City of St. Louis with murder in the first degree for the killing on March 27, 1930, of one Louis Tompkins. He was tried on October 29, 1930, found guilty of murder in the first degree and by the verdict of the jury was given the death penalty. From sentence and judgment upon the verdict he has appealed. The defense relied upon was that the shot which killed Tompkins, if fired by defendant, was fired by him in justifiable self-defense against an assault being made upon him by two women and that the killing of Tompkins was unintentional and without fault on his part. He has filed no brief in this court. The assistant attorney-general who briefed the case for the State has fairly and sufficiently stated the facts shown by the record, substantially as follows:

The evidence on the part of the State tended to prove that on and prior to March 27, 1930, Louis Tompkins and his wife Lottie resided at 3200 Pine Street in St. Louis, Missouri, and the defendant O. C. Fielder and his common-law wife Helen occupied a room in the Tompkins home as their tenants. Tompkins and his wife occupied three rooms on the first floor, the room next to the street being used as a bedroom. The middle room was the dining room and the back room was used as a kitchen. A hall ran through the house with a stairway therein leading to the second floor.

Louis Tompkins at the time of the shooting was five feet nine inches in height and weighed from 160 to 175 pounds. His age is not shown by the record. Lottie Tompkins was thirty-eight years old and weighed from 205 to 210 pounds. Helen Fielder was twenty-seven years old and weighed 181 pounds. The defendant was forty-five years old. His weight and height are not shown.

About 2:55 on the morning of March 27, 1930, police officers in the vicinity of the Tompkins home received word of a shooting there and rushed to the premises. When they arrived they found Helen Fielder lying in the front doorway dead or dying. Upon entering the hall and going into the dining room they found the bodies of Lottie Tompkins in the southwest corner and Louis Tompkins in the northwest corner of the room. Both were dead or dying. Louis Tompkins had a bullet wound in the back of his head entering on the left side, penetrating both hemispheres of the brain and lodging in the front of the right hemisphere. This wound was the cause of his death. The number of wounds received by Helen Fielder and Lottie Tompkins is not disclosed by the record. Evidently six shots

had been fired, two of them having gone wild as there was one bullet hole in the wall about three feet from the floor opposite the dining room door and another near the ceiling in the northwest corner of the room. No weapons were found in the house. The dining room contained a davenport, chairs and a table in the center upon which were some glasses. The room was not disarranged with the exception that a clothes closet therein appeared to have been opened and articles of clothing taken down.

The police officers, after the discovery and removal of the bodies, made a search for the defendant. About 6:30 that morning they received word that there had been a shooting at 3205 Laclede Avenue, about three hundred yards from the Tompkins home. On arriving there they found defendant sitting on a chair in the front room. On examination they found he had shot himself three times in the right breast, one shot going through the body. Two of the bullets lodged in the body and were not removed.

Defendant was conscious and the police asked him what he had been trying to do. He replied that he had tried to commit suicide by shooting himself and when asked the reason for so doing replied: "I wanted to end it; I didn't want to live any longer." The officers then asked him if he had killed his wife, Tompkins and Mrs. Tompkins and he said he had killed them, that he wanted to kill them all, and stated as his reason that Mrs. Tompkins had had his wife there for immoral purposes; that he had tried to get his wife away and she refused to go; that he preferred to kill her rather than have her remain there; that after he shot the women Tompkins tried to take the pistol away from him and in the struggle he shot him.

The officers obtained the gun that defendant had used in shooting himself from defendant's cousin, Ben Hand. Defendant said he had not shot the three people with that gun but had thrown away the gun he had used in killing them.

The house where defendant was found belonged to Ben Hand. Hand, his wife and son testified that defendant had frequently come to their place and stayed all night; that about 5:30 on the morning of March 27, 1930, he came to their house, changed his shirt, went to the back yard and shot himself three times, returned to the front room and had just come into the room when Hand called the police.

The evidence further shows that Mr. and Mrs. Tompkins and Helen Fielder were fully dressed at the time of the shooting. The State was unable to produce any eyewitness. It appears that a certain Sargie Robinson and one Hardy had been present but at the time of the trial Mrs. Robinson was dead and Hardy could not be found. The State's evidence consisted of the finding of the bodies and things observed by the police officers on their arrival at the Tompkins home and the statements of the defendant made to the officers after he was arrested.

Defendant took the stand in his own behalf and testified in substance that he and Helen Fielder were rooming at the Tompkins place, had lived there for several months and that he operated a sandwich stand in the neighborhood. He testified that in going to and from his business he carried a revolver for protection against robbers as he frequently had money on his person; that on the night of March 27, 1930, he came home about 11:30; that he and his wife had previously had trouble and she had moved from his room to the basement; that when he came home that night he went upstairs to his room, washed, changed clothes and came downstairs intending to go to his cousin's and arrange about securing a room there as his rent at Tompkins' was up that night; that he was upstairs thirty minutes or longer and came down and met his wife, Helen, standing in the doorway leading into the dining room; that he told her he was leaving and that they then became engaged in an altercation over his leaving and over Helen's conduct with other men and while so quarreling they stepped into the dining room; that Mrs. Tompkins then appeared on the scene and a little later Mr. Tompkins; that he explained to Mr. Tompkins why he was leaving; that there was no ill feeling or hostile demonstration whatever on the part of Mr. Tompkins who then went to another part of the room; that one word brought on another and Helen called him a liar and drew a pistol from her dress and told him he was not going to leave and that she was going to kill him; that she tried to shoot him; that at the time Helen drew the pistol Mrs. Tompkins grabbed him by his coat collar and commenced to beat him with a beer bottle; that thereupon, in order to defend himself, he seized the pistol which Helen had in her hand, drew his own revolver and began to shoot; that he must have shot six times; that he did so because Helen stated she would kill him, drew her revolver, attempted to release the safety and shoot him while Mrs. Tompkins continued to beat him with the beer bottle; that he fired in defense of himself against the assault then being made upon him by Helen and Mrs. Tompkins; that he did not know Tompkins' whereabouts at the time he fired these shots and had no intention of shooting him or doing him any harm; that the shooting was one continuous action on his part and that as soon as Helen released her hold upon the pistol which he was attempting to take away from her he left the premises, retaining the pistol and throwing away his own which was empty; that he wandered around the rest of the night and about daylight purchased a paper and read of the death of the three persons: that he then went to his cousin's house, changed his shirt, which had been badly torn in the struggle with the two women, and that after changing the shirt he went into the back yard and attempted to kill himself.

The torn shirt was introduced in evidence. Defendant also tes-

tified that a bullet passed through his overcoat sleeve in the struggle with the women but he seemed uncertain whether it was one fired by himself or his wife. The State's evidence indicated that there was a bullet hole in his overcoat sleeve. On cross-examination defendant adhered to his story that he shot to defend himself against a deadly assault being made upon him by the two women, believing himself in immediate danger of great bodily harm or death at their hands but with no intention of injuring or killing Tompkins who had taken no part in the controversy and from whom he apprehended no danger and who, if killed by him, must have been killed by a shot fired at the women.

The court gave the usual instructions on murder in the first and second degrees, presumption of innocence, reasonable doubt and credibility of witnesses which are not complained of in the motion for new trial but did not give an instruction submitting manslaughter.

██ ██ I. The court gave an instruction in the usual form on self-defense, referred to as No. 3, which, however, predicated defendant's right to act in self-defense only upon the hypothesis that he had reasonable cause to believe and did believe that *Tompkins* was about to kill him or do him great bodily harm and so believing shot and killed Tompkins to protect himself from such threatened danger from Tompkins. Defendant requested the court to instruct in effect that if he killed Tompkins while lawfully defending himself against an attack being made upon him by Lottie Tompkins and Helen Fielder he should be acquitted. The court refused that instruction and gave no instruction submitting that theory.

The giving of Instruction 3 and the failure of the court to give one submitting the theory embodied in defendant's requested instruction constituted reversible error. Under the evidence Instruction 3 had no place in the case and could only have misled the jury. Defendant made no claim and there was no evidence tending to prove that he apprehended or had reason to apprehend danger from Tompkins. On the contrary, he testified that Tompkins took no part in the difficulty and that he, defendant, did not intentionally shoot him. According to defendant's testimony he was shooting at the two women who were making a deadly assault upon him and was only attempting to defend himself against that assault. The truth or falsity of that testimony was for the determination of the jury. Defendant was entitled to have that issue submitted to the jury by appropriate instruction.

This subject was considered and authoritities cited by this court in the recent case of State v. Stallings (Mo.), 326 Mo. 1037, 33 S. W. (2d) 914, in which the facts and the defense offered were similar. There the defendant was charged with the murder of his former wife. He claimed that he had shot her unintentionally in defending

himself against an assault made upon him by one Hagan. The court said, 33 S. W. (2d) l. c. 916:

"If defendant unintentionally shot and killed deceased in the lawful exercise of his right of self-defense against Hagan, his act in killing her must be measured by his justification, if any, in shooting at Hagan. On the other hand, if defendant was not justified in shooting at Hagan on the ground of self-defense, and in so shooting at him unintentionally shot and killed Mrs. Stallings, then his guilt in killing her must be measured and the degree of the homicide determined by what his crime would have been had he shot and killed Hagan. This rule, however, would not apply if . . . defendant intentionally shot Mrs. Stallings."

The Stallings case is in point and correctly states the law applicable to the instant case. The instruction requested by defendant may not have been in all respects correct. But since the issue sought to be submitted was part of the law of the case necessary for the information of the jury in giving its verdict it was the duty of the court to give an appropriate instruction submitting it even though no request for such instruction had been made. [Sec. 3681, R. S. 1929.]

II. In view of defendant's evidence the court should have given an instruction on manslaughter. If defendant was not justified on the ground of self-defense in shooting at the women and in so shooting at them he unintentionally shot and killed Tompkins, his guilt in killing the latter "must be measured and the degree of the homicide determined by what his crime would have been" in killing the women at whom he fired. [State v. Stallings, supra.] According to his testimony he had been assaulted and struck several hard blows with a beer bottle before he drew and fired his pistol and was still being beaten when he began shooting. Though the jury may not have believed that he was justified in shooting in self-defense yet it might have found that the assault made upon him was calculated to and did arouse such passion as deprived him of self-control so that his act in shooting at the women was done without the malice that characterizes murder. See State v. Stallings, supra, where this question is discussed and where, on similar facts, it was held that an instruction on manslaughter should have been given. [See, also, State v. Heath, 221 Mo. 565, 121 S. W. 149; State v. Darling, 199 Mo. 168, 97 S. W. 592, and other cases cited in State v. Stallings, supra.] The learned assistant attorney-general frankly concedes the error in the court's failure to instruct on manslaughter as well as the error in the instructions on self-defense discussed in paragraph I hereof.

III. (a) In his motion for new trial defendant charged error in the admission of the testimony of officer Heady that the wounds inflicted upon himself by defendant shortly before the officers arrested

him and obtained from him the admission to which they testified appeared to said witness to be "superficial wounds." The only qualification the witness showed to give that testimony was that he said he "observed" the wounds while defendant lay on the operating table at the hospital to which he had been taken. He did not testify to making or witnessing any examination of the wounds such as to qualify him to testify as to their depth. That they were not superficial was shown by the testimony of Dr. Weathers, called by the State, who testified that three bullets had entered defendant's breast at the right nipple, two of which remained in his body and one of which had passed through, emerging at the back and having passed within an inch or inch and a half of defendant's heart. Heady's testimony probably was not hurtful in view of Dr. Weathers' testimony and the uncontradicted evidence that defendant was fully conscious when he made the admissions testified to and, moreover, the question to Heady in response to which he gave the testimony complained of was not objected to until it had been answered, when the objection was made and overruled but there was no motion to strike out the answer. We suggest that on another trial that testimony be omitted unless the officer shows better qualification.

■ (b) Defendant also complains in his motion for new trial of the court's refusal to permit him to testify as to his physical condition at the time of the attack made upon him by the two women. Defendant testified that he had been in a hospital about two weeks prior to the shooting and that at the time of the shooting he was still under the care of his doctor, "he had never released me." He was then asked by his counsel whether he had undergone an operation at the hospital and what his physical condition was at the time of the shooting, to which questions the State objected on the ground that the evidence was immaterial and the court sustained the objections, defendant excepting. Defendant made no offer of proof so that we are not advised what his testimony would have been and whether or not its exclusion was prejudicial. If the purpose was to show that he was weak or in bad physical condition, rendering him less able to cope with his assailants without using a deadly weapon, we think the evidence was competent as bearing upon the issue of self-defense. If evidence of such character is offered on another trial it should be admitted.

In the motion for new trial complaint is made of certain remarks in argument of counsel for the State. This need not be noticed as it may not occur again. For the reasons pointed out in paragraphs I and II hereof the judgment of the circuit court is reversed and the cause is remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.