**STATE of Missouri, Respondent,**

v.

**Eugene Edward DAVIS, Appellant.**

No. 49567.

Supreme Court of Missouri,

Division No. 1.

July 8, 1963.

Thomas F. Eagleton, Atty. Gen., Jefferson City, Martin M. Lipsitz, Sp. Asst. Atty. Gen., St. Louis, for respondent.

DALTON, Presiding Judge.

Defendant was charged and convicted of robbery in the first degree under the Habitual Criminal Act. See Secs. 560.120 and 556.280 RSMo 1959, V.A.M.S. Three prior felony convictions were alleged and shown to the court. The jury found defendant guilty of the offense charged and the court, finding that defendant had previously been convicted of a felony, assessed his punishment at ten years' imprisonment in the state penitentiary. Sec. 560.135 RSMo 1959, V.A.M.S. He was permitted to appeal as an indigent person. Sec. 485.100 RSMo 1959, V.A.M.S.

On arraignment in the trial court, defendant entered a plea of not guilty. The court found defendant to be indigent and unable to employ counsel and appointed counsel to serve without compensation as the attorney for defendant in this case. Counsel appeared and represented defendant in the trial of the cause, filed the motion for a new trial and took the appeal to this court, but he has not favored us with an appellant's brief. We shall first examine the assignments set out in his motion for a new trial. Supreme Court Rule 28.02, V.A.M.R. These assignments are directed to the exclusion of testimony offered by defendant and to the trial court's alleged release of a certain witness before the trial was concluded.

The State's evidence tended to show that on February 16, 1962, one Paul Grunmann was the owner of a building located at 4361 Washington Avenue in the City of St. Louis; that it had four floors and a basement and was divided into six units or apartments; that, on the date in question, Grunmann went to his property around 5 p. m. to collect some rents; and that at that time it was getting dark. When he arrived there he found King Edward Adams standing in the hallway. Grunmann was discussing with Adams the making of some repairs to the building when a colored man arrived, and Adams

advised Grunmann that the man was looking for some rooms and he wanted to see them. Grunmann then went up to the third floor with this man to show the rooms and, when they had gotten into the back apartment, the man pulled out a gun and asked Grunmann for his money. The man took Grunmann's wallet but, upon request, returned it together with the driver's license and other identification papers, after removing approximately seventy-five dollars. The man also took Grunmann's initial ring, his wrist-watch and a small box of silver rings. He then tied Grunmann's legs to a chair, tied his hands together, threatened him with the gun and told him not to move. A piece of rope six or eight feet long, which the colored man pulled out of his pocket, was used in tying Grunmann to the chair. After the man left, Grunmann freed himself from the chair and reported the matter to the police. Police officers arrived within five to ten minutes and discussed the matter with Grunmann and other parties at the location, and obtained a description of the robber.

A month or so after the robbery, Grunmann examined various pictures presented to him by the police department and he also viewed the defendant after his arrest. Although Grunmann noted quite a similarity between the defendant and the robber he refused to positively identify defendant as the robber. He was able, however, to say that the man who went up the steps with him was the man he had met on the first floor of the building and was the man that took his money and other property from him. On the trip to inspect the rooms they were not joined by any other persons from the time they left the first floor until after the robbery was completed on the third floor.

Isom McGee, a tenant on the first floor of the building, had visited with and talked to the man who said he wanted to rent rooms in the building. The man had been in McGee's room and had visited there for some time, but went out to get some cigarettes and returned just before Grunmann arrived. The man asked Grunmann what the rooms rented for and wanted to see them. Only Grunmann and the stranger went upstairs together. McGee had observed the stranger talking to Grunmann on the steps outside the building and had heard some of the conversation between them. About twenty minutes later Grunmann came downstairs and said that he had been robbed by the stranger. McGee subsequently saw defendant at the police station and identified him as the man previously seen at the building and as the man who had asked Grunmann about renting rooms. McGee also testified that, although he didn't know the name of the man that came into his apartment and waited for Mr. Grunmann, he knew of him. "I know of him, * * * I don't know his name." He had also heard Grunmann say to the stranger, "I will show you the room," and they then went upstairs. McGee had seen this man about three or four weeks before that. "I never knowed his name. He had named himself to me, but I could not remember the name." He so advised the police and told the police where the stranger's mother lived, or was supposed to live. McGee testified that defendant was the man who came to his apartment and then went upstairs with Grunmann.

King Edward Adams, who at one time had been the caretaker of the building for eight years and who had done some repair work and painting for the owner, testified that he was at the building to meet Grunmann and collect for some work. Adams was standing in the front door waiting for Grunmann, when McGee called to him and asked him when Grunmann would arrive. Adams said Grunmann would be there about 4:30 p. m. to collect the rents. When Grunmann arrived Adams asked him for his money, but Grunmann said wait until he had collected the rents. Adams saw the colored man who was waiting there and heard the man ask Grunmann about a room or an apartment for rent and ask about the "price." Grunmann

said that he would go up and show the apartment. About fifteen or twenty minutes later Grunmann returned with a rope tied around his arm and said he had been "held up." Adams identified the defendant as the man who was asking Grunmann about renting the apartment. He had seen the man in McGee's room, but didn't know his name. The man he saw in Isom McGee's room was the defendant in the courtroom. "I say it is him." Adams said he could not be mistaken. He had also seen the man coming downstairs from the second floor before Grunmann arrived and he had seen this same man going up the steps with Grunmann to look at the apartment.

Two police officers testified that they received a report of the robbery about 6:20 p. m. on February 16, 1962, and that they had talked to the victim (Grunmann) and made up a report of the robbery. Police Officer Dolan testified at the trial, as follows: "We learned that the man wanted for the holdup was the son of a woman by the name of Inez, who lived over on Delmar, a block away. We went over and investigated that area, and talked with several people * * * and we learned, by talking to them, that the man wanted for the holdup was the defendant here." Dolan then got a picture of the defendant and showed it to McGee and Adams and they positively identified the exhibit as a photograph of the person who went up the stairs with Grunmann, but Grunmann was unable to positively identify the photograph as that of the person who committed the robbery.

The defendant was arrested on March 8, 1962, and, when arrested, the defendant stated to Officer Dolan that he was the man that "spoke" with Mr. Grunmann at 4361 Washington on February 16th; however, he said that he had used a toy pistol instead of a real one; that he went there to rent a room and when he got Mr. Grunmann to the third floor he put the pistol on him, tied him to a chair, took his money (approximately $40) and rings and

ran out the front door. He said that he had been drinking heavily that day; and that he threw the pistol in the sewer, but he didn't remember the exact location. He also said he had disposed of the rings at various taverns in St. Louis and East St. Louis. Another officer (McDermott), who was present at the time of defendant's arrest, also testified that defendant told him substantially the same story.

Defendant testified in his own behalf and his testimony tended to show that he was 25 years of age; that he spent a part of Friday afternoon, February 16, 1962, with Isom McGee in McGee's apartment; that he stayed approximately two hours and they drank a bottle of wine together; that he left McGee's apartment during the rush hour in the evening, which would have been between 4:30 and 5 o'clock; that he did not see King Edward Adams; that he came to the apartment looking for Friedman Lee Shelby, who owed him some money for some shoes; that he was not able to find Shelby and that he went over to his stepfather's house at 4300 on Delmar, arriving there about 5:30 p. m. He sat around there and listened to the radio and waited for his mother; that she came home close to 8 p. m.; that he saw police officers there that evening and talked to them; that they asked him about the time he was at McGee's apartment and if he had seen a man loitering in the halls; that they gave him a description of the man they wanted; that he told them he hadn't seen such a man; that Isom McGee was downstairs and they took him (defendant) downstairs and asked McGee whether he (defendant) had been around his house; that McGee told them he had been, but had left early that day; that no arrest was made at that time; that the first time he ever saw Grunmann was when he saw him on March 9, 1962, at the Ninth-District Police Station; and that the first time he had seen King Edward Adams was when he saw him at the preliminary hearing sometime in March. Defendant testified that he did not take any money from Mr. Grunmann on

February 16, 1962, or at any other time. He denied that the officers had questioned him about the alleged offense and he denied that he had told them he had taken any money or anything else from Mr. Grunmann or had tied him up. Defendant admitted that he had pleaded guilty to a charge of robbery in 1958 in St. Louis; that he had also entered pleas of guilty to charges of carrying a concealed weapon and of having Cannabis Sativa (Marijuana) in his possession; that he had been sentenced to four years on his plea of guilty to robbery with a dangerous and deadly weapon; and that he received two years each on the other two charges.

Defendant testified that perhaps he had been in the building at 4361 Washington Avenue, St. Louis, ten to twelve times; that he did not go upstairs with Mr. Grunmann; that he was in McGee's apartment the whole time, until he left the building; that he did not go after any cigarettes and come back to the apartment; and that on the 16th he didn't go up to the second floor of the building and no one could have seen him coming down from the second floor.

Roy Davis, Sr., defendant's father, testified that he was familiar with the charge against his son and had talked to King Edward Adams subsequent to the date of the alleged offense and had first met Adams at defendant's preliminary hearing. He also testified that he had seen the officers at his apartment on February 16, 1962, and that he and his wife were there at that time; that the officers inquired for Eugene and he told them he lived there but wasn't at home; that he let the officers go through the house; that he was told by the officers why they were looking for his son; and that he showed the officers the room in which his son lived, but the officers did not return to his house. He said that Officer Dolan gave him a business card and his name and told him when his son came home to call or to notify the police station as they wanted to see him; that his son did come home that night and was advised of the police officers' visit but he did not call the officer after his son reached home.

■ Considered favorably to the State the evidence was entirely sufficient to sustain the conviction for robbery in the first degree. Sec. 560.120 RSMo 1959, V.A. M.S.

The first assignment in defendant's motion for a new trial is, as follows:

"1. That the Court erred in refusing to allow Roy Davis, a witness for the Defendant, to testify as to certain prior conversations he had with King Edward Adams, a witness for the State, when such testimony, if admitted, would have served to impeach the said King Edward Adams, when such testimony was admissible under the following:

"a. The said King Edward Adams testified on cross-examination that he had always identified the Defendant as the man that had gone upstairs with Paul Grunmann (the victim of the alleged robbery) when the testimony of Roy Davis, if admitted into evidence, would have shown that the witness King Edward Adams had not always identified the Defendant as he testified.

"b. The defense should have been allowed to impeach the witness King Edward Adams without the laying of a foundation for the impeachment because King Edward Adams was the principal witness for the State who identified the Defendant as the person who went upstairs with Paul Grunmann and as such was a party to this action."

The record presented here fails to show what "certain prior conversations he had with King Edward Adams * * * would have served to impeach the said King Edward Adams." No offer of proof was made and no evidence stated which, if admitted, "would have shown that the witness King Edward Adams had not always testified * * * as he testified" at the trial and at the preliminary hearing.

Clearly the record does not show what the proposed impeaching evidence consisted of, and it is impossible for us to determine from the record what the facts were or what evidence the defendant claims he should have been allowed to show without laying a foundation for the alleged impeachment of Adams. As stated, Adams had identified the defendant and testified that defendant was the person who went upstairs with Mr. Grunmann, but Adams was not a party to this action and the rule stated in Stratton v. City of Kansas City, Mo.Sup., 337 S.W.2d 927, 931, with reference to a party to the action does not apply here.

■ If we assume that some evidence was available which defendant's counsel intended to offer and that such evidence, if admitted, would have, in fact, been contradictory of and would have tended to impeach witness Adams, still there would have been no reversible error in the action of the court in excluding such evidence for the reason that it is well established that a foundation must first be laid for the alleged impeachment by interrogating the witness, sought to be impeached, concerning the alleged inconsistent statements and permitting the witness to admit, to deny or to explain the alleged inconsistent statements. State v. Thompson, Mo.Sup., 280 S.W.2d 838, 840 [2–5]; State v. Clough, 327 Mo. 700, 38 S.W.2d 36, 39 [7]; State v. Stallings, 326 Mo. 1037, 33 S.W.2d 914, 917 [10, 11, 12].

The only other assignment of error in defendant's motion for a new trial is, as follows:

"The Court erred in allowing the witness King Edward Adams to leave the area of the trial of this cause without the knowledge and/or consent of the Defendant and/or his attorney when, in order for Defendant to have a fair trial on the issue of the identity of the perpetrator of the alleged holdup, it was necessary for the jury to receive additional testimony from the witness King Edward Adams as to prior inconsistent statements which alleged statements only came to the knowledge of the attorney for the Defendant on the morning of the third day of trial."

■ We find nothing in the transcript of the record tending to show that the court did *allow* witness King Edward Adams to leave the area of the trial of this cause. Nothing in the record tends to show that the court was consulted about the matter in any manner, even if the witness did, in fact, leave the area of the trial, "or did leave without the knowledge and/or consent of the defendant and/or his attorney." We find nothing in the transcript to sustain this assignment, or any part of it. It is well settled that unverified allegations in a motion for a new trial in a criminal case do not prove themselves and cannot be considered, unless substantiated by the record or shown by proper affidavit. State v. Gray, Mo.Sup., 360 S.W.2d 642, 646 [10, 11]; State v. Henderson, 356 Mo. 1072, 204 S.W.2d 774, 780 [12–14]; State v. Smart, Mo.Sup., 328 S.W.2d 569, 576 [12, 13]; State v. Westmoreland, Mo.Sup., 126 S.W.2d 202, 203 [6, 7].

The record fails to show that witness King Edward Adams had made any prior inconsistent statement or what the alleged inconsistent statements consisted of. Nor does it appear from the record that any such alleged inconsistent statements had, in fact, come to the knowledge of the attorney for the defendant on the morning of the third day of trial. The motion for a new trial was not verified and no offer of proof was made. The allegations, unsupported by the record, do not prove themselves.

On the issues sought to be presented, the record shows that defendant's father, Roy Davis, Sr., testified that he had talked to King Edward Adams subsequent to the date on which the alleged offense charged against his son was committed. He stated that he had met and had conferences with Adams at the time of the preliminary hearing. Davis was then asked did he

(Adams) say anything about the identity of the man who went upstairs with Mr. Grunmann. Objection was made and, out of the hearing of the jury, counsel for the defendant stated that he was trying to impeach the State's witness by showing that different statements were made by Adams to the witness Davis. The State objected on the ground that no foundation had been laid for impeachment while Adams was on the stand, since Adams had not been asked whether he had made any particular statements inconsistent with the testimony he had given. The objection was sustained. The record shows the following:

"MR. WATSON: [defendant's counsel] I would like to recall Adams to put him on the stand. Is he here today?

"MR. CRAWFORD: [representing the State] No, sir.

"MR. WATSON: I thought he would be available today."

\* \* \* \* \* \*

(The hearing was then resumed before the jury.)

\* \* \* \* \* \*

"Q (By Mr. Watson) Did he [Adams] make any statement as to whether or not he recognized the man who went upstairs with Mr. Grunmann?"

Objection was again made that no foundation had been laid for this question when Adams was on the stand. The objection was sustained.

The record does not show how or why the witness Adams had left "the area of the trial," or that Adams had made any prior inconsistent statements in conflict with his testimony at the trial. Defendant's counsel did not file an affidavit of surprise, or claim oversight or surprise, nor did counsel state the evidence that he proposed to offer. The motion for a new trial is equally defective. Defendant's counsel did not request a continuance or recess until Adams was available, nor did he ask the court to issue a subpoena for Adams and

have the sheriff produce him. State v. Neal, 350 Mo. 1002, 169 S.W.2d 686, 697 [17]. Defendant's counsel did subsequently offer into evidence the transcript of Adams' testimony at the preliminary hearing. We find no material variance between Adams' testimony at the trial and that given at the preliminary hearing.

At defendant's preliminary hearing Adams testified, in part, as follows:

"Q Directing your attention to February 16th this year at approximately— well, in the afternoon, were you at 4361 Washington?

"A I was.

"Q What were you doing there, sir?

"A Waiting for Mr. Grunmann, to get my pay. I work for him.

"Q Was anybody else there with you, at that time?

"A Yes, lots of children out there in the hallway and Mr. Isom was out there.

"Q Did you see Eugene Davis?

"A I don't know him by name, I don't; I saw the fellow.

"Q Did you see the fellow in custody of the police?

"A Yes, sir, at the showup.

"Q Do you see him? Do you see him in the courtroom?

"A Yes, sir, it's the same fellow.

"Q Did you see him at that apartment on that evening?

"A That's the same fellow; yes, sir.

"Q Where is he now in the courtroom?

"A I don't know him. That's him."

On the record presented both assignments of error in the motion for a new trial must be denied. It is so ordered.

We have further reviewed those record matters not required to be preserved in the motion for a new trial, which matters we examine irrespective of whether they are

questioned on the appeal (Supreme Court Rule 28.02), and we find no error therein prejudicial to defendant.

The judgment is affirmed.

All concur.