**STATE of Missouri, Respondent,**

v.

**Michael WEEMS, Appellant.**

**No. 74521.**

Supreme Court of Missouri,
En Banc.

Oct. 27, 1992.

Craig A. Johnston, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PATRICIA BRECKENRIDGE, Special Judge.

Michael Weems appeals from his convictions, after jury trial, for murder in the first degree, § 565.020.1, RSMo 1986,[1] robbery in the first degree, § 569.020, and armed criminal action, § 571.015, for which he was sentenced to consecutive sentences of life imprisonment without possibility of probation or parole and two thirty-year terms, respectively. He also appeals from the overruling of his Rule 29.15 motion for post-conviction relief. The appeals have been consolidated pursuant to Rule 29.-15(1).

Mr. Weems presents six points in his direct appeal, claiming that the trial court erred by: (1) refusing to submit an instruction on self-defense; (2) overruling his motion for acquittal as to Count II, first degree robbery, as the evidence presented was insufficient to show that he forcibly stole property or caused serious physical injury in the course of stealing said property; (3) failing to sua sponte declare a mistrial due to error in the state's closing argument; (4) submitting the verdict directing instruction on armed criminal action because said instruction hypothesized that Mr. Weems committed the offense with a "deadly weapon" and the evidence was insufficient to prove he had done so; (5) admitting certain photographs into evidence as said photographs were prejudicial in that they were cumulative, gruesome and unduly inflammatory; and (6) advising defense counsel that it would instruct upon self-defense and then refusing to give such an instruction. In his 29.15 appeal, Mr. Weems challenges the denial of his motion for post-conviction relief contending that the motion court clearly erred because his trial counsel was ineffectual in advising him not to testify in his own defense. The judgment is reversed and the cause remanded for new trial. The 29.15 appeal is dismissed as moot.

On June 23, 1988, the body of Roy Chester Vales was discovered in the bedroom of his residence. There were sixteen injuries to Mr. Vales' head, including multiple areas of fracture to the skull and fracture to the jawbone. Expert testimony established that Mr. Vales was alive when the blows were struck and that the blows were of such force so as to cause damage to the function of Mr. Vales' brain. An electrical cord had been wrapped twice around Mr. Vales' neck and knotted, tightly enough to potentially cut off the air supply and blood supply to his head. The blows to Mr. Vales' head and the ligature around Mr. Vales' neck were competing causes of his death. There was a large amount of blood on the pillows at the head of the bed, as well as a splattering of blood on the wall behind the bed and on the furniture near the bed. After Roy Vales' body was found, it was also discovered that his car, a black Toyota Corolla, was missing. Mr. Vales had last been seen alive on June 18, 1988.

On the same day that the body was found, Antonio Jones saw Mr. Weems and asked him for a ride to the airport. Mr. Weems agreed, and Mr. Jones purchased five dollars in gasoline for the car Mr. Weems was driving, a black Toyota Corolla. Mr. Weems dropped Mr. Jones off at Jones' residence, telling him that he would return after freshening up. Mr. Weems never returned.

Mr. Jones tried to contact the driver of the Toyota whose name he believed to be Chester Vales, as he had seen that name inside of the car and discussed the distinc-

---

1. All statutory citations are to Revised Missouri Statutes 1986, unless otherwise stated.

tiveness of the name with Mr. Weems. Mr. Jones tried calling all the listed "Vales" in the phone book. Mr. Jones spoke with a woman who had known the deceased Mr. Vales. She informed Mr. Jones that Mr. Vales had been found dead that morning. Mr. Jones told the woman that Mr. Vales could not be dead because he had been with "Vales" earlier that morning. Mr. Jones later spoke to the police, telling them about his encounter with "Vales" and the black Toyota.

On June 24, 1988, Sergeant Alfred Adkins of the St. Louis City Police Department and Jackie Hendricks, an investigator for that same department, spotted Mr. Vales' car. Mr. Weems was standing in front of the car. He was arrested, advised of his *Miranda* rights and taken to the police department for questioning.

Mr. Weems' initial story was that he had acquired the car from Mr. Vales on June 18, 1988, because he had no transportation. Sergeant Adkins noticed that Mr. Weems was wearing shoes with soles similarly patterned to a bloody shoe print found on the sheets of Mr. Vales' bed. Sergeant Adkins had Mr. Weems remove the shoes. He noticed what appeared to be dried blood upon them. The sergeant informed Mr. Weems that he did not believe his story and that Mr. Vales had been found dead. Mr. Weems then described the events culminating in Mr. Vales' death. The officers took both an audiotaped and a videotaped statement. The audiotape was played to the jury during Mr. Weems' trial. Mr. Weems' out-of-court statements to police were the only evidence, other than the physical evidence, of the events that preceded Mr. Vales' death.

Mr. Weems related, in his audiotaped statement, that he had known Mr. Vales for a month and he had helped work on Mr. Vales' house. Mr. Vales asked Mr. Weems to have sex with him but had been rebuffed. Mr. Weems had been out with Mr. Vales on Saturday, June 18, 1988. Mr. Weems was drinking and Mr. Vales was smoking marijuana. Mr. Weems became intoxicated and started throwing up. He asked Mr. Vales if he could spend the night. Mr. Vales consented. The two men slept in the same bed with Mr. Vales' head at the head of the bed and Mr. Weems' head at the foot of the bed.

The following morning, Mr. Weems awoke to find Mr. Vales on top of him attempting to "have sex" with him. He pushed him off and ran from the room. Clad only in a pair of shorts, Mr. Weems armed himself with a hammer and returned to the bedroom to retrieve his clothing.[2] Mr. Vales, semi-prone on the bed, told Mr. Weems he could only get his clothes and leave if they had sex. Mr. Weems called Mr. Vales a "bitch." Mr. Vales punched Mr. Weems in the head with his fist. Mr. Weems retaliated, hitting Mr. Vales with the hammer. A fight ensued, with Mr. Vales striking with his fists and Mr. Weems with the hammer. At one point Mr. Weems was attempting to go out the bedroom door, but Mr. Vales grabbed him and wouldn't let go. Mr. Weems bumped into a lamp, picked it up and pushed Mr. Weems with it. He then yanked the cord from the lamp. Mr. Weems reached behind himself while Mr. Vales had him in a chokehold, wrapped the cord around Mr. Vales' neck and started pulling. He continued to pull until Mr. Vales let go.

Mr. Weems proceeded to dress in some of Mr. Vales' clothes, as his own clothing was covered with blood. He took a pair of Mr. Vales' sneakers to wear. He took forty dollars from Mr. Vales' wallet and a key to Mr. Vales' car. As he left, Mr. Weems ran across the bed, leaving a bloody footprint on the sheets. He took Mr. Vales' car and left.

At the time of the incident, Mr. Weems was nineteen years old, six-feet tall and weighed approximately 150 pounds. Mr. Vales was thirty-three years old, five-foot eleven inches tall and weighed approximately 185 pounds.

■ In his first point, Mr. Weems claims that the trial court erred by its refusal to submit to the jury defense Instruction A—Justification: Use of Force in

---

2. The shorts that Mr. Weems was wearing were outer wear rather than underwear.

Self Defense, based on MAI–CR3rd 306.06. The trial court has an obligation to submit a self-defense instruction if the issue is supported by the evidence, when viewed in the light most favorable to the defendant. *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984). Failure to submit such an instruction constitutes reversible error. *Id.* at 784; *State v. Strother*, 807 S.W.2d 120, 122 (Mo.App.1991).

■ The right to use force in defense of persons is codified in Section 563.031, which reads in pertinent part as follows:

1. A person may, subject to the provisions of subsection 2, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

(1) The actor was the initial aggressor; except that in such case his use of force is nevertheless justifiable provided

(a) He has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force[.]

\*  \*  \*  \*  \*  \*

2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 unless he reasonably believes that such deadly force is necessary to protect himself or another against death, serious physical injury, rape, sodomy or kidnapping.

3. The justification afforded by this section extends to the use of physical restraint as protective force provided that the actor takes all reasonable measures to terminate the restraint as soon as it is reasonable to do so.

4. The defendant shall have the burden of injecting the issues of justification under this section.

Four elements must be present to allow the use of deadly force in self-defense. As set forth in *Chambers*, 671 S.W.2d at 783, they are:

(1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life.

As discussed in *State v. McQueen*, 431 S.W.2d 445, 448–49 (Mo.1968), the quantum of proof necessary to require the giving of a self-defense instruction has been defined in various ways:

This quantum of proof has been variously defined as "substantial evidence," *State v. Rose*, Mo., 346 S.W.2d 54; *State v. Baker*, Mo., 277 S.W.2d 627; *State v. Singleton*, Mo., 77 S.W.2d 80; "evidence putting it in issue," *State v. Ford*, 344 Mo. 1219, 130 S.W.2d 635; "any theory of innocence \* \* \* however improbable that theory may seem, so long as the most favorable construction of the evidence supports it," *State v. Kinard*, Mo., 245 S.W.2d 890; "supported by evidence," *State v. Robinson*, supra [Mo., 328 S.W.2d 667]; "any theory of the case which his evidence tended to establish," *State v. Stallings*, 326 Mo. 1037, 33 S.W.2d 914; "established defense," *State v. Sumpter*, Mo., 184 S.W.2d 1005; and "evidence to support the theory," *State v. Shiles*, Mo., 188 S.W.2d 7.

Mr. Weems claims entitlement to an instruction on self-defense arguing he was forced to defend himself with deadly force in that Mr. Vales' attempted to forcibly sodomize him; Mr. Vales struck him first and continued striking him with his fists; and then Mr. Vales tried to choke him to death. Considering Mr. Weems' version of the events resulting in Mr. Vales' death, there are questions of fact whether there was an absence of aggression on the part of Mr. Weems, whether Mr. Weems was justified in using deadly force, and whether Mr. Weems did all within his power consistent with his personal safety to avoid the danger and the need to take a life. Specifi-

cally, the trial court erred in finding, as a matter of law, that the evidence in the case was insufficient to support the giving of a self-defense instruction to the jury. Reference to the record reveals evidence, viewed in the light most favorable to defendant, that supports the submission of a self-defense instruction.

There is evidence that Mr. Vales was the aggressor in his initial attempt to sodomize Mr. Weems. The issue is whether Mr. Weems then became the aggressor upon his return to the bedroom or whether, even if he were not the aggressor, his return was a failure to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. Under Mr. Weems' theory, his subsequent reappearance into the bedroom in search of his clothing was not intended as a renewal of an altercation. Accepting Mr. Weems' version of the events resulting in Mr. Vales' death, it is a question of fact whether Mr. Weems' armed return to the bedroom could be expected to result in a renewal of the altercation or was instead merely an attempt to obtain his clothing. His actions should be considered in light of the circumstances as they existed when Mr. Weems returned. Such circumstances were that Mr. Weems was able to resist Mr. Vales' sexual advances by merely pushing him off and running from the room; Mr. Vales failed to pursue Mr. Weems from the bedroom; previously Mr. Vales had peaceably accepted Mr. Weems' rejections of his advances; Mr. Weems was clothed only in his shorts and was not wearing shoes; and apparently Mr. Weems did not have his own transportation from Mr. Vales' residence.

It is also for the jury to determine whether there was a real or apparently real necessity for Mr. Weems to kill in order to save himself from an immediate danger and whether Mr. Weems' belief in the necessity of using deadly force was reasonable. *Chambers*, 671 at 783; *State v. Peek*, 806 S.W.2d 504, 506 (Mo.App.1991). According to Mr. Weems' audiotaped statement, upon his return to the bedroom for his clothing Mr. Vales was again the aggressor, punching Mr. Weems in the head. Mr. Weems then hit Mr. Vales with the hammer and continued hitting him as Mr. Vales kept fighting. Mr. Vales put Mr. Weems in a choke-hold. At this point, Mr. Weems grabbed the lamp cord, wrapping it around Mr. Vales' neck until Vales passed out. Mr. Weems thereafter grabbed some clothes, took $40 from Mr. Vales' wallet, took Mr. Vales' car key and left. However improbable, there is evidence to support the self-defense theory put forward by the defense.

Mr. Weems also stresses the physical differences between himself and the victim; Mr. Vales was older and outweighed Mr. Weems by over thirty pounds. Such matters are factors to be considered by the jury as well.

Finally, it is within the sound discretion of the jury whether Mr. Weems did all that was within his power to avoid danger and the need to take Mr. Vales' life.[3] *Chambers*, 671 S.W.2d at 783–784. Whether he

---

**3.** This Court in *State v. Roberts*, 294 Mo. 284, 242 S.W. 669 (1922), on similar facts, held that the trial court should not have given an instruction on self-defense. The facts, however, are distinguishable. In *Roberts*, the defendant became involved in a quarrel with his neighbor. The neighbor picked up a neck yoke and started to strike defendant with it. When defendant jumped back, the neighbor threw the neck yoke toward defendant and threatened to kill defendant. Defendant went to his home, got a shotgun and returned to the location of his neighbor. He claimed self-defense in shooting and killing the neighbor, when the neighbor picked up an ax and came toward him.

This Court held an instruction on self-defense should not have been given in that, from defendant's own testimony, it was clear he had returned with the purpose of renewing the quarrel. *Id.* 242 S.W. at 673. In addition, the testimony was uncontroverted that the defendant was not in immediate danger and had ample opportunity to withdraw to his house without risk to his safety. *Id.* 242 S.W. at 674.

The distinguishing factor is that the defendant in *Roberts* had no need to return to the scene of the quarrel. His only motivation was "to settle the matter" with his neighbor, whom he knew to be a dangerous and turbulent man. In the case at bar, Mr. Weems was returning to secure his clothing. It is for the jury to determine whether such a decision to return, rather than retreat, precludes him from acting in self-defense.

should have pursued another course of action, or fled either after Mr. Vales' initial sexual advances or upon Mr. Vales striking him, cannot be decided as matters of law. These are factual matters and, as such, are properly jury considerations. Mr. Weems was entitled to a self-defense instruction. *Refusal to so instruct was error and Mr. Weems' conviction for first-degree murder is reversed.*

■ Reversal on the murder charge necessitates reversal of Mr. Weems' conviction for armed criminal action because the armed criminal action conviction was dependent upon a finding by the jury that, in accord with its instructions, Mr. Weems committed murder in the first degree. A conviction for armed criminal action requires the commission of an underlying felony. *State ex rel. Westfall v. Ruddy*, 621 S.W.2d 42, 44 (Mo. banc 1981).

■ Reversal on Mr. Weems' conviction for first degree robbery is also mandated. Section 569.020, under which Mr. Weems was convicted of robbery, provides that "A person commits robbery in the first degree when he forcibly steals property...." The term "forcibly steals" is defined in § 569.-010. It provides:

a person "forcibly steals", and thereby commits robbery, when, in the course of stealing, as defined in section 570.030, RSMo, he uses or threatens the immediate use of physical force upon another person for the purpose of:

(a) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking....

Because the jury was not allowed an instruction on self-defense, effectively taking the issue out of its consideration, its deliberation on the "purpose" of the physical force was likewise tainted in its consideration of the first degree robbery count.

■ This is a reversal on that charge, however, not an acquittal. It is therefore necessary to review Mr. Weems' challenge to the sufficiency of the evidence on robbery in the first degree. He argues that the state failed to prove that he used physical force for the purpose of preventing resistance to the taking of the property and that he caused serious physical injury in the course of forcible stealing. The evidence presented at trial was sufficient to support a criminal conviction.

■ For purposes of reviewing the sufficiency of the evidence, all evidence is viewed in the light most favorable to the verdict. *State v. Guinan*, 665 S.W.2d 325, 329 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). All evidence supporting the verdict is regarded as true and all contrary evidence disregarded. *State v. Adkins*, 800 S.W.2d 28, 30 (Mo.App.1990). Review is limited to whether there is sufficient evidence from which the defendant could be found guilty by reasonable persons. *State v. Moseley*, 705 S.W.2d 613, 616 (Mo.App.1986).

The statute under which Mr. Weems was convicted, § 569.020, provides in pertinent part:

A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime,

(1) Causes serious physical injury to any person[.]

From the evidence presented at trial, reasonable jurors could have found that Mr. Weems used physical force against Mr. Vales for the purpose of preventing resistance to the taking of Mr. Vales' property, and in the course of that taking caused serious physical injury to Mr. Vales.

■ As used in the context of forcible stealing, "in the course of" is a broad term, covering the whole transaction. So long as the fear or violence precedes or is contemporaneous with the taking, the offense of robbery is complete. *State v. Yancy*, 779 S.W.2d 712, 715 (Mo.App.1989). The formation of Mr. Weems' intent to take Mr. Vales' forty dollars and car might have been found to have occurred either before or during the incident, rather than after as Mr. Weems contends. The jury was not bound to accept Mr. Weems' self-serving version of the events. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). More-

over, the fact that Mr. Vales was unaware of the robbery does not make Mr. Weems' actions less culpable since it was Mr. Weems' use of force that rendered Mr. Vales unaware of the taking. *State v. Meyer*, 694 S.W.2d 853, 855 (Mo.App.1985).

In reversing Mr. Weems' convictions and remanding for new trial, the rest of his points, save one, need not be addressed as they concern errors not likely to occur on retrial. The disposition of this appeal also renders Mr. Weems' 29.15 post-conviction appeal moot.

██ Mr. Weems claims error by the trial court in receiving the state's photographic exhibits, Nos. 17–18, 32–41 and 47–50, into evidence. He claims that any probative value of these exhibits was outweighed by their prejudicial effect because said photographic exhibits were cumulative, gruesome and unduly inflammatory.

██ Photographs, although gruesome, are generally admissible if relevant to a material issue in the case. *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). The trial court has broad discretion in the admission of photographs. *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc 1991). They may be admitted where they depict the nature and location of wounds, where they aid the jury in understanding testimony or aid in establishing any element of the state's case. *Murray*, 744 S.W.2d at 772. Photographs are also relevant where they portray the condition or location of the victim's body. *Feltrop*, 803 S.W.2d at 10.

None of the challenged photographs is so gruesome or so unusual that the prejudice engendered by their admission outweighs their probative value. *Id.* at 11. Insofar as the challenged photographs can be looked upon as shocking and gruesome, it is because the crime is of that nature. *Id.*

Exhibits Nos. 17 and 18 depict two views of Mr. Vales' bedroom. They show the concentration of blood at the head of Mr. Vales' bed and are of aid to the jury in understanding the testimony presented at trial. Exhibits Nos. 32 through 34 depict Mr. Vales' body as discovered on the floor of his residence. They depict the condition and location of the body and thus their admission was not erroneous. Exhibits Nos. 35 through 38 depict four views of the electrical cord tied around Mr. Vales' neck by Mr. Weems. These photographs were of aid to the jury in understanding the forensic testimony. They also were of aid in establishing elements of the state's case against Mr. Weems as they depict the strangulation of Mr. Vales by an electrical cord. Exhibits Nos. 39–41 are three views of Mr. Vales' Toyota Corolla, the vehicle taken by Mr. Weems after his altercation with Mr. Vales. Again, said photographs were of aid to the jury in understanding the testimony, particularly that of Antonio Jones. Finally, Exhibits Nos. 42–50 depict the nature and location of the wounds inflicted upon the victim's head from the front, back, left side and right side. These photographs depicted the nature and location of Mr. Vales' wounds. All of these photographs were relevant to the method of commission of the crime and their admission was not erroneous, nor would it be so on retrial.

The judgment is reversed and the cause remanded for new trial.

ROBERTSON, C.J., and COVINGTON, HOLSTEIN, BENTON, THOMAS and PRICE, JJ., concur.

LIMBAUGH, J., not sitting because not a member of the Court when case was submitted.