STATE of Missouri, Plaintiff/Respondent,

v.

Walter ISREAL, Jr., Defendant/Appellant.

No. 63355.

Missouri Court of Appeals,
Eastern District,
Division One.

March 22, 1994.

Charles M. Shaw, Shaw, Howlett & Knappenberger, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary Moulton Bryan, Asst. Atty. Gen., Jefferson City, for respondent.

REINHARD, Judge.

Defendant was convicted by a jury of: Count I, second degree murder, § 565.021.-1(1), RSMo 1986;[1] Count II, armed criminal action, § 571.015; Count III, first degree assault, § 565.050; and Count IV, armed criminal action, § 571.015.[2] He was sen-

---

1. All statutory citations are RSMo 1986, unless otherwise noted.

2. Counts I and II stem from the shooting death of Gregory Claxton. Counts III and IV stem from the non-fatal shooting of Joseph Lester Price. Defendant and co-defendant Liggins were jointly charged by indictment with first degree murder and armed criminal action in the death of Claxton, and first degree assault and armed criminal action in the shooting of Price. After a joint trial, Liggins was acquitted of all charges. Defendant was acquitted of first degree murder,

tenced by the court, in accordance with the jury's recommendation, to a ten year sentence on Count I and a consecutive sentence of three years on Count II; a ten year sentence on Count III and a consecutive three year sentence on Count IV. The sentences on Count I and Count III were to run concurrently with each other; those on Counts II and Count IV were to run concurrently with each other, and consecutively to Counts I and III. Defendant appeals, asserting the trial court erred in refusing to instruct the jury on involuntary manslaughter, in overruling his *Batson* objections and in impermissibly defining the state's burden of proof. Because of the trial court's failure to give the requested manslaughter instruction, we reverse and remand for a new trial defendant's convictions on Counts I and II. We affirm in all other respects.

The state adduced evidence from several witnesses regarding the events of August 5, 1991. Antonio Carter, defendant's cousin, testified that at about 3:30 p.m., he, defendant, and co-defendant Cornell Liggins were traveling in a 1985 black and gold Chevrolet Blazer to a house on 6450 Etzel in Wellston. Defendant was driving. Liggins had spoken earlier to a man named J.J. Buchanon (a/k/a Jerome McDaniels), who was to sell Liggins and defendant jewelry. When the men arrived at the Buchanon residence, Liggins exited the Blazer, while defendant and Carter remained inside.

Lester Joseph Price (a/k/a Joe Hughes) testified that he and Gregory Claxton were sitting on the hood of one of two cars parked in front of the Buchanon house when the Blazer arrived. He stated there were two other men sitting in that general area on that afternoon. When Price saw the Blazer park and Liggins get out, he approached the driver's side window and had an argument with defendant which lasted approximately two minutes. Carter heard the argument from the Blazer's back seat. He stated Price, "said something cruel-like to [defendant] and [defendant] was like '[n]o, let's stop. Let's keep what happened in the past'...." The men agreed to drop their disagreement. Price returned to his previous seat on the

vehicle's hood. When Liggins returned to the Blazer, defendant drove away.

Price testified that the Blazer returned approximately five to ten minutes later. When it was parallel to the car directly in front of the one on which Price was sitting, Price saw "[defendant] hop out of the car, and as he was hopping out ... he shot me in [the] stomach." Claxton, who was attempting to flee, crossed between defendant and Price and was struck by three bullets: in the left arm, left knee and the abdomen (which, according to the medical testimony, was the fatal shot). Price then saw defendant leap onto the Blazer's hood and the vehicle drive east down Etzel.

Carter did not witness the shooting, but stated he heard shots about thirty to forty-five seconds after defendant had exited the Blazer.

Lori Ann Weatherly was leaving work at 3:30 p.m. on August 5, 1991, when she heard two gunshots followed a few seconds later by four more. She then saw a black Blazer coming east down Etzel with a black man on its hood. She saw the Blazer stop, the man get off the hood and into the Blazer, and the Blazer drive off. She returned to her office and called the police.

Officer Ricky Collins, of the Wellston police department, and his partner were dispatched to the scene. They arrived thirty seconds to one minute after receiving the dispatch. They found Claxton sprawled on the ground with a crowd of people gathered nearby. The officers found Price lying on the floor at his mother's house (a few houses away from the crime scene). Both men were taken to hospitals. Price underwent extensive surgery. Claxton was declared dead at Barnes Hospital. The officers' search of the crime scene revealed five spent .22 caliber casings and a rusty paring knife laying about six feet from Claxton's body. Interviews with various parties led the police to arrest Isreal and Liggins.

Defendant testified at trial in support of his claim of self-defense. He stated that at approximately 2:30 p.m. on the afternoon of

but convicted of the lesser included offense of second degree murder.

the shooting, he was contacted by Liggins regarding the possibility of purchasing jewelry from one of Liggins' acquaintances, J.J. Buchanon. Defendant had previously had problems with Price, and knew Price lived in Buchanon's neighborhood. Consequently, he removed his father's .22 caliber pistol from its storage area in the Blazer.[3] Once the men had arrived at the Buchanon residence, and Liggins had departed, defendant stated that Price approached the Blazer and told him "he was going to kick my a—." After a brief discussion, defendant testified, he and Price agreed to "quash" their differences.

When Liggins returned to the Blazer, he informed defendant that Buchanon was no longer home. The men then set out in search of him, eventually finding him in a factory lot. Liggins and Buchanon then made plans to meet back at the Buchanon house.

Liggins was now driving when the men returned to 6450 Etzel. Defendant testified that he exited the Blazer, saw Buchanon, and started walking toward him. Though defendant had seen a number of men sitting on the two cars parked in front of the Buchanon residence, he did not recognize any of them until he saw Price vacate his seat on the back car. Price moved to block defendant's path and said, "punk a— nigger, I thought I told you not to come around here no more." Price then reached "behind his back and pulled out a knife and ... took a step toward me." When Price was approximately three to five feet from defendant, defendant "put [his] left arm over [his] face ... crouched down, and ... began shooting." Defendant was taking small steps back as he fired. After defendant had fired all of the gun's rounds, he looked up and "that's when I saw Claxton [being held] in like a full-nelson, but I didn't know who was behind him." He then saw Price push Claxton to the ground and run off.

Buchanon also testified that Price was wielding a knife when defendant began shooting. He further noted that defendant had "ducked" immediately prior to the gunfire. Greg Luan Goudeau testified that he had passed the Buchanon address just prior

to the shooting. He stated: "I was standing in between [the Buchanon house and the house directly to its east], ... when I turned around I [saw] [Price] getting ready to fight, saying like he was getting ready to poke somebody. Then I heard shots." Goudeau stated that five people were standing in the vicinity of Price when the shooting began.

Jury instructions were given on first degree murder, second degree murder, first degree assault and armed criminal action. An instruction on self-defense was also given; however, defendant's proffered instruction of involuntary manslaughter was refused.

On appeal, defendant argues the court erred in refusing his proffered instruction of manslaughter in that the evidence showed "[he] [had] the right to fire [the] pistol in self defense [but did] it recklessly." We find this contention to be meritorious.

■ Involuntary manslaughter can be a lesser included offense of murder in the first and second degree. *State v. Miller*, 772 S.W.2d 782, 783 (Mo.App.1989); § 565.025. If one of the parties requests, the court must instruct on that issue "if the evidence arguably shows lack of an essential element of the higher offense which would not only authorize acquittal of the higher but sustain a conviction of the lesser." *State v. Hamlett*, 756 S.W.2d 197, 199 (Mo.App.1988); § 556.-046.2. "The question is whether the evidence, in fact or by inference, provides a *basis* for *both* an acquittal of the greater offense and a conviction of the lesser offense." *State v. Harris*, 825 S.W.2d 644 (Mo. App.1992) (emphasis in original). In *Harris*, we stated:

A person commits the crime of involuntary manslaughter if he "recklessly" causes the death of another. § 565.024.1(1). A person acts "recklessly" when "he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.-016.4 Thus, recklessness as used in our

---

**3.** The Blazer was owned by defendant's grandfather.

Criminal Code and the Model Penal Code, "involves conscious risk creation. It resembles knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than a substantial certainty...." *Model Penal Code, supra,* § 202 at 236.

*Id.* at 647–48.

The circumstances of the instant case are somewhat similar to those of *State v. Miller,* 772 S.W.2d 782 (Mo.App.1989). There the defendant was charged with second degree murder. He was acquitted of that charge and convicted of the lesser included offense of involuntary manslaughter. On appeal, the defendant contended the court erred *in submitting* the involuntary manslaughter instruction and in refusing to give defendant's proffered self-defense instruction. In *Miller,* the defendant and Brad Inman had an argument in a tavern. Later, when Inman was leaving the tavern, defendant reached into the back of his vehicle and grabbed a rifle. The rifle was discharged and the bullet caused the death of a bar patron. The evidence was conflicting as to how or why the rifle was fired. Inman stated that the defendant had simply missed after he "pointed the rifle at him and fired it...." *Id.* at 783. The defendant and his companion, Sarah Risher, testified that just prior to the rifle firing, Inman was verbally threatening and gesturing at them. They stated that the defendant was holding the rifle level at his waist when Risher grabbed the gun and it discharged. The defendant stated that he did not know, when he picked up the gun, whether the safety was on or off, but he did know it was loaded.

Our colleagues in the Southern District held that the facts were sufficient to support an involuntary manslaughter instruction. The court noted that the tavern had approximately twenty-five patrons at the time of the shooting and that "[t]he jurors could find that by handling the weapon and having it pointed toward the tavern when the safety was in such a position that it could be fired, the defendant was acting recklessly...." *Id.* at 783–84.

A distinction between the instant case and *Miller* is that there the trial court gave the manslaughter instruction but rejected defendant's self-defense instruction. The issue of whether self-defense should have been submitted as a defense to the second degree murder charge was rendered moot by defendant's acquittal on that charge. Regarding defendant's argument that the jury should have been instructed on self-defense on the involuntary manslaughter charge, the court stated, "[s]elf-defense *might justify* producing the weapon to prevent being attacked ... but [it] would not justify the reckless handling of it." *Id.* at 784 (emphasis added).[4]

■ Here, defendant's evidence justified the submission of a self-defense instruction and one was given. The jury was told it must find the defendant not guilty of any of the charges relating to either Price or Claxton if it found defendant had been "acting in lawful self-defense." However, the evidence also revealed that, when defendant began shooting, several people were very close to, or perhaps even in, the line of fire. In defendant's version of the incident, he essentially covered his eyes and retreated while firing all of the rounds in his gun. Thus, the jury could have found that defendant had consciously disregarded a substantial and unjustifiable risk that bystanders would be killed. The evidence, as in *Miller,* justified the submission of an involuntary manslaughter instruction. The court thus committed reversible error in failing to submit such an instruction upon defendant's request. Defendant's convictions on Count I and II are reversed and remanded to the trial court for a new trial on those charges. However, it is also necessary to address defendant's remaining points on appeal.

---

4. "If ... the perpetrator of the homicide or of the assault had no criminal intent in attempting to injure or kill another person, as where the perpetrator was lawfully defending himself from the harm sought to be inflicted upon him by such other person, the fact that, on that occasion, a third person was unintentionally injured or killed by the perpetrator would not make him liable, *unless the perpetrator acted carelessly or without regard to the safety of innocent bystanders.*" Annot., Self-defense—Unintended Injury or Death, 55 A.L.R.3d 620, 622–23 (1974) (emphasis added) (footnote omitted).

Defendant also asserts the trial court "committed prejudicial error in overruling [his] [*Batson*] objections to the state's peremptory challenges ... [in that] the [state] did not give sufficient race neutral reasons when four of the remaining five blacks on the jury panel were stricken...."

The trial court's decision on the issue of discriminatory intent represents a finding of fact and is entitled to great deference on appeal. *State v. Davis*, 835 S.W.2d 525, 527 (Mo.App.E.D.1992). In overruling defendant's motions, the trial court found the state had race neutral, non-pretextual bases for the challenged strikes. We have reviewed the record and conclude the court's findings in this regard are not clearly erroneous.

Defendant's final point on appeal asserts the trial court erred in submitting Instruction No. 4, patterned after MAI–CR3d 302.04. There is no merit to defendant's contention that this instruction improperly defines the term "proof beyond a reasonable doubt." The definition of reasonable doubt found in MAI–CR3d 302.04 is constitutionally sound. *State v. Ervin*, 835 S.W.2d 905, 924 (Mo. banc 1992).

Defendant's convictions for first degree assault (Count III) and armed criminal action (Count IV) are affirmed. His convictions for second degree murder (Count I) and armed criminal action (Count II) are reversed and remanded for a new trial.

CRANDALL, P.J., and CRIST, J., concur.