**STATE of Missouri, Respondent,**

v.

**Michael ALBANESE, Appellant.**

No. WD 50892.

Missouri Court of Appeals,
Western District.

Feb. 13, 1996.

As Modified April 2, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 2, 1996.

Application to Transfer Denied
May 28, 1996.

Kevin E.J. Regan, Yonke, Arnold, Newbold & Regan, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before BRECKENRIDGE, P.J., and ULRICH and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Defendant–Appellant Michael Albanese appeals his convictions for voluntary manslaughter, § 565.023, RSMo 1994, and armed criminal action, § 571.015, RSMo 1994, for which he was sentenced to a total of forty-five years imprisonment as a prior and persistent offender. Mr. Albanese contends on appeal that: (1) the trial court erred in refusing to submit a jury instruction on self-defense; (2) the trial court erred in refusing to submit a jury instruction on involuntary manslaughter; (3) the trial court erred in barring defense counsel from questioning a State's witness about prior convictions; and (4) the trial court erred in allowing Dr. Berkland to testify about the autopsy results reached by Dr. Mitruka because an adequate foundation was not laid for the admission of such evidence.

We agree with Defendant that the trial court erred in failing to submit a self-defense instruction and remand for a new trial.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Defendant–Appellant Michael Albanese was charged with one count of second degree murder, § 565.021(1), and one count of armed criminal action, § 571.015, for the stabbing death of Jay Hudson in the early morning hours of November 19, 1993.

On November 19, 1993, the victim Jay Hudson travelled from Oklahoma to Kansas City, Missouri, with his uncle Joe Robison and five co-workers from the Robison Rock Manufacturing Company. The men travelled to Kansas City in order to install rock siding on a local gas station. After finishing the job, the group had dinner and then travelled in two pickup trucks to the Westport entertainment area in Kansas City.

While in Westport, the group went to various entertainment establishments until approximately 2:00 a.m. At that point, they decided to leave Westport. Because Mr. Hudson was going to lead the group back to their hotel, he drove the first truck. He had one passenger, Jeff Sacket, a co-worker. The other men were in the second truck, which was being driven by Mr. Robison.

In the course of leaving the Westport area, Mr. Hudson made a right-hand turn from Westport Road onto Pennsylvania Avenue. In making this turn, Mr. Hudson pulled out in front of and cut-off a Cadillac which was driven by the defendant Mr. Albanese. Mr. Albanese had been attempting to make a right-hand turn onto Pennsylvania. Mr. Albanese completed his own turn after Mr. Hudson drove by him, and both cars travelled about half a block down Pennsylvania. They were followed by the truck driven by Mr. Robison.

About one-half block from the intersection, Mr. Hudson stopped his truck. It is unclear why Mr. Hudson stopped, as there was no other traffic or stop sign, but some witnesses later speculated that Mr. Hudson was lost and might have been thinking of turning down an alley. In any event, Mr. Albanese rear-ended Mr. Hudson's truck once it stopped. Mr. Albanese testified that the collision was an accident.

After the collision, both Mr. Hudson and Mr. Albanese left their vehicles and Mr. Hudson approached Mr. Albanese, waved his arms around and asked why Mr. Albanese had hit his truck. Mr. Hudson put his hand on Mr. Albanese's shoulder a couple of times and Mr. Albanese knocked his hand away. Mr. Albanese then struck Mr. Hudson and a fight ensued between the two men.

Mr. Hudson, who was 6'1" tall and weighted 149 pounds, was unarmed. Mr. Albanese, who was 5'8" tall and weighed 165 to 180 pounds, had a serrated work knife clipped to his pocket.[1]

While all of the witnesses agree that the altercation only lasted 20 seconds to a minute, the testimony as to exactly what happened in what order during this brief period

---

1. Mr. Albanese used the knife at his job at a tile shop to cut tile and open boxes.

varied considerably. According to Mr. Albanese, after he struck Mr. Hudson, Mr. Hudson took two or three steps backwards. Mr. Albanese claims that he was then grabbed around the neck by one of the other men from the second pickup and was then punched in the left side by yet another man. It was only at that point that Mr. Albanese says he grabbed the knife, flipped it open and "lashed out recklessly" in what turned out to be a fatal blow to Mr. Hudson.

Mr. Albanese said he lashed out with the knife because he believed he had to defend himself, and he did not intentionally murder Mr. Hudson. Mr. Albanese testified that all of the men fell to the ground, Mr. Albanese slipped out, threw the knife away, and ran down an alley. When questioned on cross-examination about his actions in "lashing out recklessly" with the knife, Mr. Albanese further testified as follows:

Q: So then you said you lashed out recklessly?

A: Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: All these men are around you and you're lashing out recklessly, right?

A: Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Well, now, if you're defending yourself against the tall skinny guy from Oklahoma, and if you're scared and need to defend yourself, you would intentionally want to either swing the knife at him or stab him, right?

A: I don't follow you.

Q: If you're trying to defend yourself?

A: By defending myself, I lashed out, yes.

Q: So then it was a conscious effort what you were doing with the knife, right?

A: A conscious effort to hit him in the heart, no, sir. To get them off of me, yes.

Q: Okay. So then when you're using that knife, you're not really using it recklessly like you say, you know what you're doing with it, you're using it to keep them away, right?

A: Right.

Q: So then it really wasn't a reckless use of the knife; you know what you're using it for, don't you?

A: It was reckless as in my movement when I swung it wildly, yes.

Q: But you're swinging it this way to keep them away (indicating)?

A: No, I swung from my right side up.

Q: Well, you said you swung, so whether you swing from the right side up or however, you brought it up intending to use it, right?

A: Yes.

Q: So when you hit someone, it really wasn't recklessly that you stabbed them, you meant to bring that knife up to use it, right?

A: Yes.

The State presented the testimony of other, independent witnesses who saw the altercation from a bar directly across from where the collision occurred. They testified, contrary to Mr. Albanese, that Mr. Albanese stabbed Mr. Hudson when the two men were still fighting one-on-one, and that no one else was around or was attacking Mr. Albanese at the time Mr. Albanese used his knife. These witnesses said that it was not until after Mr. Hudson was stabbed that the other men intervened.

Mr. Robison, the driver of the second truck, also testified. He stated that he arrived at the scene of the altercation in the second truck with the other men just as Mr. Albanese was stabbing Mr. Hudson. Mr. Robison and the other gentlemen then jumped out of the second truck and pulled Mr. Albanese off of Mr. Hudson. Mr. Albanese then threw the knife away and ran down the alley.

Dr. Michael E. Berkland, the medical examiner for Johnson County, testified as to the cause of death from an autopsy report that was prepared by Dr. Mitruka. This testimony was admitted over the objection of defense counsel that this testimony lacked foundation because there was insufficient evidence that Dr. Mitruka was an expert in the field of forensic pathology at the time he completed the autopsy. Dr. Berkland testi-

fied that the cause of death was a fatal stab wound to Mr. Hudson's heart.

Under Count I, the jury was instructed on second degree murder and the lesser included offense of voluntary manslaughter. Counsel for Mr. Albanese requested a self-defense instruction, as well as a verdict director for the lesser-included offense of involuntary manslaughter. The trial court at one point considered submitting these instructions, but ultimately refused to do so, stating that there was not substantial evidence to support these submissions. The jury was also instructed on armed criminal action under Count II.

The jury found Mr. Albanese guilty under Count I of the lesser included offense of voluntary manslaughter and under Count II of armed criminal action. Mr. Albanese was sentenced as a prior and persistent offender to fifteen years under Count I and to thirty years under Count II, the sentences to be served consecutively.

Mr. Albanese filed a Motion for a New Trial raising the same issues that are raised in this appeal. The trial court denied Mr. Albanese's motion and this appeal followed.

## II. THE TRIAL COURT ERRED IN RE-FUSING TO SUBMIT A SELF–DE-FENSE INSTRUCTION BUT DID NOT ERR IN REFUSING TO SUB-MIT THE LESSER INCLUDED OF-FENSE OF INVOLUNTARY MAN-SLAUGHTER

Mr. Albanese contends that the trial court erred in refusing to submit a self-defense instruction, as well as an instruction on the lesser included offense of involuntary manslaughter because the evidence supported a verdict of guilty of involuntary manslaughter.

### A. Standard of Review.

The State contends that the errors alleged by Mr. Albanese in failing to submit a self-defense instruction and an involuntary man-

slaughter instruction were not preserved for appellate review because the refused instructions were not set out in the argument portion of Mr. Albanese's brief.

■ Rule 30.06(e) states that refused instructions "shall be set forth in full in the argument portion of the brief." First, we note that, while the refused instructions were omitted from Mr. Albanese's initial brief, they were included in his Reply Brief. Thus, they are available for our review.

■ The State argues that, even if Mr. Albanese were entitled to a self-defense instruction, the one he offered was erroneous. We· agree the instruction offered did not follow MAI as it should have. We note, however, that numerous cases have held that, where defendant meets his burden of inject-ing self-defense into the case, the court must instruct on self-defense even in the absence of a request for such an instruction. MAI–CR3d 306.06, Notes on Use 2; State v. Blackman, 875 S.W.2d 122, 132 (Mo.App. 1994); State v. Ehlers, 685 S.W.2d 942, 948 (Mo.App.1985). The same is necessarily true where, as here, such an instruction was of-fered but it was not in proper form.

■ Finally, as noted in State v. Hop-son, 891 S.W.2d 851, 852 (Mo.App.1995), a failure to include the refused instruction in the brief does not preclude review of a claim of instructional error where the refused in-struction is a pattern instruction. This is because in such a case:

> The issue before us does not deal with the adequacy or correctness of the instruction requested but with the question of law of whether it was required to be given in view of the evidence. Our review of that issue is in no way hampered by the absence of the instruction in the brief.

Id. at 852. See also Dillard v. Atchison, Topeka & Santa Fe Ry., 882 S.W.2d 211, 213 (Mo.App.1994).[2] The refused involuntary

---

**2.** The State also contends that Mr. Albanese has not properly preserved Points I—IV for appellate review because he did not provide transcript citations for the factual allegations contained in the Argument portions of his brief for each of these points as required by Rule 30.06(h). While Mr. Albanese did fail to provide transcript cita-

tions to the factual allegations made in the Argu-ment portion of his brief, the facts set out in the Argument section of the brief are accurate, and are supported by adequate transcript references in the factual section of his brief and in his reply brief. As it is this Court's policy "to decide cases on the merits whenever possible" and to avoid

manslaughter instruction was based on a pattern instruction, and thus falls within this exception.

For these reasons, this Court will thus review on the merits Mr. Albanese's claims of error in failing to submit a self-defense instruction or an involuntary manslaughter instruction.

### B. *The Trial Court Erred in Refusing to Submit Self-defense to the Jury.*

■ Mr. Albanese contends the trial court erred in refusing to submit the issue of self-defense to the jury. Self-defense "grants a defender the privilege to use deadly force in an effort to defend himself...." *State v. Fincher*, 655 S.W.2d 54, 59 (Mo.App. 1983) (citations omitted). To support this defense, there must be evidence of:

(1) an absence of aggression or provocation on the part of the defender;

(2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death;

(3) a reasonable cause for the defender's belief in such necessity; and

(4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life.

*State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984).

■ If there is substantial evidence of self-defense, the trial court must instruct the jury on self-defense whether or not the defendant requests the instruction. MAI–CR3d 306.06, Notes on Use 2. In making this determination, the evidence is to be viewed in the light most favorable to the defendant. *Chambers*, 671 S.W.2d at 783. Moreover, where the evidence conflicts, it is a question of fact for the jury to determine whether the accused acted in self-defense. *Id.* at 782.

*Chambers* explains the circumstances under which a jury should be instructed on self-defense. The defendant in *Chambers* appealed following his conviction of capital murder,

contending that the trial court erred in refusing to submit the issue of self-defense to the jury. According to defendant's evidence, the victim walked up to the defendant and struck him in the face, knocking the defendant to the ground. The defendant then shot the victim and struck him several times in the face with a gun. *Id.* The victim was 6'4" and weighed 250 pounds, while the defendant was 5'6" and weighed only 150 pounds. *Id.* at 783.

The Missouri Supreme Court reversed the trial court's refusal to submit self-defense to the jury. Initially, it noted that, while the State's evidence presented a different version of the facts (wherein the defendant was the initial aggressor), the evidence was to be viewed in the light most favorable to the defendant. *Id.* When viewed in this manner, the evidence indicated that the victim was the initial aggressor.

*Chambers* went on to explain that, in order for self-defense to be submitted, there must be some "affirmative action, gesture or communication by the person feared indicating the immediacy of the danger, the ability to avoid it and the necessity of using deadly force must also be present." *Id.* Under the facts presented in *Chambers*, while the fear of size alone was not sufficient to justify the use of deadly force, the difference in size plus the fact that the victim was the initial aggressor could have "created an appearance of necessity for defendant to use deadly force to protect himself...." *Id.* In so holding, *Chambers* explained that "[t]he reasonableness of a defender's belief in the necessity of using deadly force is generally a question for the jury." *Id.*

As to the final element, that the defendant did all within his power consistent with his personal safety to avoid danger, *Chambers* explained that:

In resisting an assault a person is not required to determine with absolute certainty ... the amount of force necessary for that purpose.... The law does exact of him however that he shall not use any

"punish[ing] innocent parties for the shortcomings of counsel on appeal," *Thummel v. King*, 570 S.W.2d 679, 690 (Mo. banc 1978), we treat

Mr. Albanese's contentions on appeal as properly preserved. *See also State v. Tivis*, 884 S.W.2d 28, 29 n. 2 (Mo.App.1994).

more force than shall reasonably appear to him in the circumstances to be necessary
. . .

*Id.* (citations omitted). *Chambers* held that this element was also satisfied, noting that while the defendant "might have pursued a course of conduct other than shooting the victim, the reasonableness of such other conduct would be within the sound discretion of the jury." *Id.* at 783–84. *Chambers* thus held that the evidence of self-defense was sufficient to submit the issue to the jury. *Id.* at 784.

While *Chambers* involved a one-on-one fight between two individuals of difference sizes, its reasoning applies equally well to this case. We must, of course, view the evidence in the light most favorable to Mr. Albanese. Were the jury to believe Mr. Albanese's view of events, it could find that Mr. Hudson approached Mr. Albanese's car swinging his arms and yelling, and that he kept "hitting his hand" on Mr. Albanese's shoulder. According to Mr. Albanese, after he had brushed off Mr. Hudson's hand twice, he punched Mr. Hudson because he believed that Mr. Hudson was "ready to fight." On these facts, a jury question was presented as to whether Mr. Albanese or Mr. Hudson was the initial aggressor.

█ Second, again according to Mr. Albanese, after he hit Mr. Hudson he was grabbed from behind around the neck by one of Mr. Hudson's co-workers and struck at the same time in the side by another of Mr. Hudson's co-workers. It was at this point that he took out his knife and lashed out with it, killing Mr. Hudson.

On these facts, as in *Chambers*, whether it was necessary for Mr. Albanese to use deadly force and whether there was another means by which he could have protected his personal safety are thus issues for the jury.[3] Assuming sufficient facts are presented upon remand, the theory of self-defense should be submitted to the jury under an instruction based on MAI–CR3d 306.06.[4]

█ Reversal and remand of Mr. Albanese's conviction of voluntary manslaughter because of the failure to submit the issue of self-defense also requires reversal and remand of his conviction of armed criminal action, as conviction of the latter crime requires the commission of an underlying felony. *State v. Weems,* 840 S.W.2d 222, 228 (Mo. banc 1992).

### C. The Failure to Submit An Involuntary Manslaughter Instruction Was Not Error.

As noted at the outset of this opinion, the trial court instructed on second degree murder and voluntary manslaughter, and the jury convicted Mr. Albanese of the latter offense but acquitted him of second degree murder. Mr. Albanese contends that the trial court erred in refusing to also submit an instruction on the lesser included offense of involuntary manslaughter.

█ The trial court must instruct on each theory or degree of an offense "if the evidence arguably shows lack of an essential element of the higher offense which would not only authorize acquittal of the higher but sustain a conviction of the lesser." *State v. Isreal,* 872 S.W.2d 647, 649 (Mo.App.1994) (citations omitted). If "the evidence, in fact or by inference, provides a *basis* for *both* an acquittal of the greater offense and a conviction of the lesser offense," then the jury must be instructed on the lesser included offense. *Id.* (citations omitted).

---

3. In so holding, we reaffirm that deadly force may not be used to repel a simple assault and battery. *See, e.g., State v. Sprake,* 637 S.W.2d 724, 727 (Mo.App.1982). Here, however, if the jury believes Mr. Albanese's testimony that he only pulled out the knife after being attacked by both Mr. Hudson and his two co-workers, than the jury could find that Mr. Albanese was faced with more than a simple assault and battery.

4. It should be noted that if the evidence were viewed in the light most favorable to the State, then the submission of self-defense is not supported by the evidence. The State's evidence was that Mr. Albanese and Mr. Hudson were engaged in a one-on-one fight when Mr. Albanese stabbed Mr. Hudson. Under these circumstances, this Court has held that it was not error to refuse to submit self-defense to the jury. *See, e.g., State v. Strother,* 807 S.W.2d 120 (Mo.App. 1991) (no substantial evidence of self-defense where evidence showed two men which were pushing, shoving and grabbing hold of each other in an one-on-one altercation).

Involuntary manslaughter is a lesser included offense of murder in the second degree. § 565.025. A person is guilty of involuntary manslaughter if he "[r]ecklessly causes the death of another person." § 565.024.1(1). Thus, in order to submit an instruction on involuntary manslaughter, there must be sufficient evidence to support a finding of recklessness. MAI–CR3d 313.00.4(A)(4), Supp. Notes on Use Applicable to 313.00 series.

A person acts "recklessly" when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. As *Isreal* explained, recklessness "involves conscious risk creation. It resembles knowingly in that a state of awareness is involved, but the awareness is of risk, that is of probability less than a substantial certainty." *Isreal*, 872 S.W.2d at 650 (citations omitted).

Mr. Albanese contends he was entitled to an instruction on involuntary manslaughter because his testimony established that he did not intentionally kill Mr. Hudson but rather "lashed out recklessly" with the knife. This lashing out was not a conscious effort to kill Mr. Hudson, he argued, but was done to get the other men off of him. The State argues that by Mr. Albanese's own testimony on cross-examination (set forth in full above), Mr. Albanese's actions clearly did not come within the meaning of "recklessly," and, in fact, "engaged in conscious, not reckless, action."

We agree with the State that an involuntary manslaughter instruction was not required. Under Mr. Albanese's version of the events in question he may have been justified in pulling out a knife and using it— that is, using deadly force—to defend himself against the victim and his two companions, because he feared that they would cause him great bodily harm. Thus, he testified, he intentionally used the knife to defend himself, as he claimed he was justified in doing. If the jury below had agreed that his use of the knife was justified, it should have been permitted to acquit him on the basis of self-defense. If, on the other hand, the jury did not believe that deadly force was justified, or if the jury believed that Mr. Albanese went beyond what was required for self-defense, then it would have been required to reject his claim of self-defense.

This does not mean it could convict of involuntary manslaughter, however. Involuntary manslaughter results from consciously *disregarding* a substantial and *unjustifiable risk* of injury to another. It is a reckless act that results in the unintended death of another person. Here, however, while Mr. Albanese may have characterized his manner of swinging the knife as "reckless," it was not reckless in the legal sense, for he specifically intended to lash out with his knife in the very manner in which he did intending to create a substantial risk of causing death or serious physical injury to his purported attackers. While he may not have formed a specific intent to kill the victim, he thus intended to use deadly force and must have known that in so doing he might kill the person against whom he used the knife, as occurred here.

It may be that, if the circumstances were as described by Mr. Albanese, his use of the knife in this manner was justified because it was necessary in order to deal with the threat posed by three attackers. If it was not justified, however, then it constituted an unjustified *intentional* act. Such facts do not support a submission of involuntary manslaughter. Indeed, it is specifically because the claim of self-defense requires an intentional act whereas the claim of involuntary manslaughter requires a reckless act culminating in an unintended result, that numerous cases have held that the two defenses are inconsistent and cannot be submitted together where they both depend on jury acceptance of the defendant's testimony. *See, e.g., State v. Sanders* 541 S.W.2d 530, 533 (Mo. banc 1976); *State v. Miller*, 772 S.W.2d 782, 784 (Mo.App.1989).

At least one case, *State v. Isreal*, 872 S.W.2d 647, 649 (Mo.App.1994), suggests that in the circumstances of that case the two defenses were not inconsistent. We note, however, that there, the claim of involuntary

manslaughter was raised in response to the killing of a bystander. The evidence supported the submission that defendant was acting in self-defense in warding off an attack when he fired, injuring his attacker but killing the bystander. On these facts, the jury could consistently have found both self-defense as to the attacker and involuntary manslaughter as to the bystander, who was shot only because the defendant continued firing with his eyes closed after he pulled out a gun to defend himself.

The trial court thus did not err in refusing to submit the involuntary manslaughter instruction.

### III. THE TRIAL COURT DID NOT ERR BY NOT ALLOWING APPELLANT'S COUNSEL TO CROSS–EXAMINE A STATE'S WITNESS REGARDING HIS PRIOR CONVICTIONS OF VIOLATIONS OF MUNICIPAL ORDINANCES

■ Mr. Albanese also appeals the trial court's refusal to allow his trial counsel to question Mr. Hammonds, a State's witness who was one of Mr. Hudson's co-workers and a witness to the incident, regarding his prior convictions for driving under the influence ("DUI").[5]

Mr. Hammonds admitted during his pretrial deposition that he had previously been convicted of two DUI's in Oklahoma. Mr. Hammonds testified on direct examination for the State regarding the events surrounding the stabbing of Mr. Hudson. When Mr. Albanese's counsel attempted to impeach Mr. Hammonds on cross examination with his prior DUI convictions, the State objected on the grounds that they were convictions for violation of municipal ordinances and were not felony or misdemeanor convictions. The prosecutor stated that he had run Mr. Hammonds' name through the State's computer and no state or federal convictions came up. Based on this assurance, the trial court sustained the objection. Mr. Albanese then made an offer of proof as follows:

Q: Mr. Hammonds, I need to ask you some questions to make a record for the Court outside the presence of the jury. Have you, sir, committed the crime of DUI in Oklahoma in 1980 and 1985?

A: Yes, sir. In '80, I had a DUI and in '85, I had a DWI.

Q: And you, sir, admitted committing the crime of DUI in 1980 and the crime of DWI in 1985?

A: Yes, sir.

The trial court then reiterated that it sustained the State's objection as to questioning Mr. Hammonds regarding these DUIs for purposes of impeachment.

■ It is well-established in Missouri that a witness can be questioned regarding prior criminal convictions for purposes of impeachment. *Neal v. State*, 669 S.W.2d 254, 262 (Mo.App.1984). Such convictions are admissible pursuant to Section 491.050, which provides in relevant part that:

Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case. . . .

§ 491.050, Supp.1993. It is equally well-established, however, that this rule does not extend to convictions of violations of municipal ordinances, so that "a party cannot impeach a witness with a municipal ordinance violation." *First Nat'l Bank v. Kansas City S. Ry.*, 865 S.W.2d 719, 737 (Mo.App.1993); *State v. Keenan*, 779 S.W.2d 743, 746 (Mo.App.1989).

■ In order to establish a sufficient foundation, the offer of proof must "state facts which are specific and sufficient in detail to establish admissibility." *First Nat'l Bank*, 865 S.W.2d at 737 (citations omitted). Admissibility is not established by mere conclusions of the offering counsel. *Id.*; *State v.*

---

**5.** While Mr. Albanese's Motion for New Trial and Point Relied On in his appellate brief only mention Mr. Hammonds, in the argument portion of his brief Mr. Albanese mentions another State witness, Mr. Merker. To the extent Mr. Albanese is claiming error as to Mr. Merker, this claim is waived by his failure to include Mr. Merker in his Motion for New Trial and Point Relied On. *State v. Hill*, 866 S.W.2d 160, 164 n. 3 (Mo.App. 1993).

*Townsend,* 737 S.W.2d 191, 192 (Mo. banc 1987).

██ Mr. Albanese's offer of proof and record presented on appeal do not provide a basis for determining whether Mr. Hammonds' DUI convictions were for state offenses as opposed to municipal violations. The trial court therefore did not err in refusing to allow Mr. Albanese's counsel to question Mr. Hammonds regarding these prior convictions. If, however, on retrial Mr. Albanese establishes that the convictions were for state or federal offenses rather than municipal violations, and if Mr. Hammonds denies they occurred, then Mr. Albanese would be allowed to question Mr. Hammonds regarding these convictions.

## IV. THE TRIAL COURT DID NOT ERR IN ALLOWING DR. BERKLAND TO TESTIFY ABOUT THE AUTOPSY RESULTS REACHED BY DR. MITRUKA BECAUSE AN ADEQUATE FOUNDATION FOR SUCH EVIDENCE WAS ESTABLISHED BY DR. BERKLAND'S TESTIMONY

For his final point on appeal, Mr. Albanese contends the trial court erred in allowing Dr. Berkland to testify regarding the autopsy results reached by Dr. Mitruka, the person who actually performed the autopsy on Mr. Hudson. Mr. Albanese contends that the State did not establish a sufficient foundation for this testimony because there was insufficient foundation that Dr. Mitruka was an expert in the field of forensic pathology at the time he completed the autopsy.

██ In order to lay an adequate foundation to establish the expertise of a witness it "must be shown that a witness has sufficient experience and acquaintance with the phenomena involved to testify as an expert." *State v. Watt,* 884 S.W.2d 413, 415 (Mo.App. 1994) (citations omitted). It is not required, however, that the preparer of the report establish the foundation. Testimony by a custodian, supervisor or other employee is sufficient to lay a foundation where the person can testify as to the qualifications of the individual who actually performed the test. *See, e.g., State v. Hall,* 750 S.W.2d 637, 639 (Mo.App.1988). Moreover, "[t]he authorities generally agree that it would be impractical to set any absolute standard as to the qualifications of an expert witness; and that of necessity the question must rest largely in the sound discretion of the trial court." *Id.* (citations omitted).

██ Dr. Mitruka's resume was entered into evidence, and Dr. Berkland, the Johnson County Medical Examiner, testified in detail as to Dr. Mitruka's educational and professional background. Dr. Berkland testified that Dr. Mitruka:

> attended the medical school of Ross University School of Medicine at Portsmouth, West Indies. He did further postgraduate training at Monmounth Medical Center in New Jersey for his pathology residency. He worked at West Virginia University in West Virginia, Morgantown, and then was a fellow at Truman Medical Center.

Dr. Berkland also testified that Dr. Mitruka was board eligible in anatomical and clinical pathology, meaning that he had completed a four-year residency program in these areas. Dr. Berkland also testified that he has worked with Dr. Mitruka for a period of time, has observed him perform numerous autopsies and it was his opinion that Dr. Mitruka knew how to perform autopsies. Based on this evidence, Mr. Albanese's foundation objection was overruled by the trial court.

This evidence supported the trial court's determination that Dr. Mitruka was qualified as an expert in the field of forensic pathology at the time he completed the autopsy. *See, e.g., Hall,* 750 S.W.2d at 638–39 (Mo.App. 1988) (adequate foundation laid where there was evidence which showed expert's employer, degrees in the field and experience conducting the type of test at issue).[6] The trial court did not err in admitting this evidence.

---

6. *State v. Watt,* 884 S.W.2d 413 (Mo.App.1994), cited by Mr. Albanese in support of his argument, is distinguishable. *Watt* held that an adequate foundation was not laid where the only evidence as to the report preparer's expertise was that she had worked in the crime lab. *Id.* at 415–16. *Watt* is unlike this case, for in *Watt* there was no testimony regarding the witness' education, level of experience or competency to perform the test at issue.

For the reasons stated above, we reverse the judgment below and remand for a new trial.

All concur.