**STATE of Missouri, Plaintiff–Respondent,**

v.

**Phillip Eugene ZUMWALT, Defendant–Appellant.**

No. 21809.

Missouri Court of Appeals, Southern District, Division Two.

June 11, 1998.

Susan McGraugh, Asst. Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Capanegro, Asst. Atty. Gen., Jefferson City, for Respondent.

SHRUM, Judge.

Defendant appeals from his convictions by a jury of second-degree assault for causing physical injury to one Marion Ray by recklessly discharging a firearm, § 565.060.1(5), and armed criminal action, § 571.015.[1] The trial court imposed sentences of seven years and three years respectively, to run consecutively.

On appeal, Defendant charges that the trial court committed reversible error concerning self-defense instructions. We agree. We reverse and remand.

Defendant was charged with first-degree assault and armed criminal action in the shooting of Marion Ray on June 20, 1993. This shooting occurred on "O" highway in Crawford County, Missouri.

Before Marion Ray was shot, another altercation occurred outside Gale Williams' house in Crawford County. Ron Faulkner, Ken Faulkner, James Quinton, and Marion Ray were at the Williams' property during the earlier incident. These men then left the Gale Williams' property in an automobile driven by Ron Faulkner. Ultimately, the same four persons were on highway "O" when they met a Jeep driven by Darrell Williams and occupied by Defendant and another passenger, Jeffrey Renner.

The following explains Defendant's presence in Darrell's Jeep. After the incident at his house, Gale Williams called his brother Darrell to tell him of the trouble. Darrell then picked up Defendant and Renner and they were going toward Cuba, Missouri, when they met the Faulkner car.

---

1. All statutory citations are to Revised Statutes of Missouri 1994, unless otherwise stated.

Upon meeting Faulkner's car, Darrell turned his Jeep around and began following that vehicle. At some point, Darrell handed Defendant a Ruger .22 caliber rifle. Conflicting testimony exists concerning what happened after Darrell turned his Jeep around.

Both Ron and Ken Faulkner testified that Darrell's Jeep rammed the car in which they were riding. According to the Faulkners, Defendant started shooting at their car while they were in the car. Ken Faulkner was struck in the arm by a bullet. Ron Faulkner and Marion Ray then got out of the car. Marion Ray testified that just after he got out of the car, he was shot in the chest.

Defendant testified that Ron Faulkner stopped his car in the middle of the road. He saw Ron Faulkner reach behind the seat of his car and get something "shiny" in his hand. As Ron Faulkner "turned to come towards ... the jeep [Defendant] could see ... that he had a pistol ... or a gun in [his hand]." Thereon, Defendant squeezed the trigger of the rifle he was holding, but it did not fire. He drew the gun back into the Jeep to "put a bullet into the chamber." At the same time, he "holler[ed]" at Ron Faulkner to "put down the gun." According to Defendant, he then heard Ron Faulkner fire his weapon. This prompted Defendant to fire three or four shots at the "people" who were shooting at him. Apparently, one of these shots hit Ray.

To support Defendant's version of events, the defense introduced at trial a .38 caliber Taurus revolver. Kenny Setzer, the brother-in-law of James Quinton, testified that he discovered the revolver at the scene of the shooting the day after the incident. The defense offered other testimony in an attempt to link the revolver to James Quinton. Photographs showing bullet holes in Darrell's Jeep were admitted into evidence. An expert witness testified that a bullet fragment recovered from the Jeep had been fired from the Taurus revolver. A witness, Orville Crocker, testified that on the day in question, he heard gunfire from "two different guns." He first heard a shot from a "large caliber pistol," something larger than a .22 caliber

weapon. This was followed by "several shots" from a smaller weapon.

The State submitted and the trial court gave verdict-directing instructions for both first-degree and second-degree assault. During discussions about a self-defense instruction, the State voiced its opposition saying that Marion Ray was not a "bystander" but was "a party with Ron Faulkner." The trial court ruled it would give a self-defense instruction, whereon both the State and Defendant submitted their proposals for such instruction. The State's submission—which the trial court gave—was patterned exactly after MAI–CR3d 306.06, i.e., the instruction had Marion Ray's name (victim) inserted in the pertinent portions. Contrarily, Defendant submitted a self-defense instruction patterned after MAI–CR3d 306.06 but with this modification: Defendant's instruction contained the name "Ronnie Faulkner" (alleged aggressor), not Marion Ray (victim). Defendant argued that he was acting in self-defense in response to Ron Faulkner's acts, but hit Marion Ray, who the defense insisted was a bystander. The trial court refused to give Defendant's modified self-defense instruction.

■ Defendant premises error on the trial court's decision regarding these two instructions. We agree.

■ Missouri courts have long applied the rule that if the killing or injury of a person intended to be hit would, under all the circumstances, have been excusable or justifiable on the theory of self-defense, then the unintended killing or injury of a bystander by a random shot fired in the proper and prudent exercise of such self-defense is also excusable or justifiable. *See State v. Fielder,* 330 Mo. 747, 50 S.W.2d 1031, 1034 (1932); *State v. Stallings,* 326 Mo. 1037, 33 S.W.2d 914, 916 (1930); *State v. Harris,* 717 S.W.2d 233, 235[3] (Mo.App.1986).

■ Here, Defendant argues that the evidence shows that he was shooting at Ron Faulkner, but inadvertently hit Marion Ray. Defendant reprises his claim, made during the instruction conference and in his motion for new trial, that Ray was a bystander. Thus, Defendant reasons, the self-defense in-

struction should reflect Missouri case law that an individual who acts in self-defense against an aggressor, but who ends up wounding a bystander, can raise self-defense in a prosecution for wounding the bystander. *See Harris,* 717 S.W.2d at 235.

The State responds by arguing that the trial court did not err because Marion Ray was not a bystander, but a participant in the incident. Consequently, the State insists that use of an unmodified MAI–CR3d 306.06 that inserted Marion Ray's name in the pertinent portions of the instruction was correct. In support of this proposition, the State points to Defendant's testimony that he was shooting at the "people" who were shooting at him, and that he was shooting because he was afraid that if he did not shoot, "they" would shoot him. The State further contends:

> "Other evidence also suggests that [Defendant] was attempting to protect himself against the entire group, rather than just Ron Faulkner. Most notably, Ron Faulkner was *not* shot, but Ken Faulkner was shot in the arm, and Marion Ray was shot in the chest. In other words, to grant [Defendant's] argument, one must accept the unlikely proposition that Ken Faulkner and Marion Ray were 'bystanders' to the fight. It seems more likely, however, that [Defendant] was afraid of the entire group, and that [Defendant] was attempting to stop all of them with his gun."

Based on these arguments, the State asserts that the trial court did not err when it refused to instruct the jury on the justified shooting of a bystander. We disagree.

▮▮▮▮ An accused is entitled to an instruction on any theory that the evidence tends to establish. *State v. Hopson,* 891 S.W.2d 851, 852[3] (Mo.App.1995). If there is substantial evidence of self-defense, a trial court must submit a self-defense instruction to the jury. *State v. Albanese,* 920 S.W.2d 917, 923[9] (Mo.App.1996); MAI–CR3d 306.06, Notes on Use 2. In deciding this question, trial courts must view the evidence in the light most favorable to the accused. *Albanese,* 920 S.W.2d at 924[10]. Any conflict in self-defense evidence is to be resolved by a properly-instructed jury. *Id.* at 923[11].

The State elicited the following from Defendant upon cross-examination:

"Q. [to Defendant] Sir, in any of this malay [sic] that occurred, even today, according to your testimony, Marion Ray never pulled a gun on you?

"A. I don't know Marion Ray.

"Q. You know who he is now, don't you?

"A. Yes.

"Q. He never pulled a gun on you, did he?

"A. No, I don't believe so, no.

"Q. *He was never a threat to you, was he?*

"A. *No.*" (emphasis supplied).

Besides Defendant's testimony that he did *not* perceive Marion Ray as a threat, Jeffrey Renner testified that he saw Ron Faulkner outside the car and that Faulkner was "mouthing us." Renner continued: "I seen Ronnie pull up the pistol [in his hand] before I got out of the vehicle." According to Renner, when Ron Faulkner was about 15 feet away from the Jeep, he pointed the gun "at us." This prompted Renner to leave the Jeep, whereon, he heard a gun shot.

Similarly, Defendant testified that he saw Ron Faulkner, the driver of the car in front, "open the door and get out." Next, Ron Faulkner said something that Defendant "could not make out" and Defendant saw Faulkner take "a couple of steps toward the Jeep." According to Defendant, Ron Faulkner then turned around, went back to the car, and retrieved "something shiny" from the car. As Ron Faulkner turned back toward the Jeep and raised his arm, Defendant saw that he had a pistol in his hand. Defendant then "got [the rifle] into [his] hand and raised it up into the air." As he did this, he "hollered out the window, put the gun down and squeezed the trigger" but "nothing" happened because he "hadn't put a bullet into the chamber." According to Defendant, he then heard Faulkner's gun "go off." Thereon, Defendant loaded his gun and while opening the Jeep door, began "squeezing the trigger on the rifle."

We must take this evidence as true in considering whether Defendant was entitled

to a "bystander" type of self-defense instruction. *See Albanese,* 920 S.W.2d at 924. Based on such evidence, a jury could find that Defendant fired his weapon in response to actions by Ron Faulkner alone. Consequently, Defendant was entitled to—but did not get—a self-defense instruction based on the theory that Marion Ray was a bystander, not an aggressor. *See Hopson,* 891 S.W.2d at 852[3].

■ Appellate courts reverse for instructional error when there is prejudice to a defendant. *State v. Richardson,* 951 S.W.2d 718, 721[3] (Mo.App.1997); Rule 28.03(f). To determine prejudice, the facts and instruction are reviewed together as a whole. *State v. Boone,* 908 S.W.2d 165, 167[3] (Mo.App. 1995). Prejudice occurs when a jury "may have been adversely influenced by an erroneous instruction." *State v. Rodgers,* 641 S.W.2d 83, 85[5] (Mo.banc 1982) (quoting *State v. Aitkens,* 352 Mo. 746, 762, 179 S.W.2d 84, 94 (1944)).

For reasons given later, we are persuaded that Defendant was entitled to have the jury consider whether Defendant's intentional act of shooting in the direction of Ron Faulkner and his automobile was justified. However, the self-defense instruction given did not inform the jury of that possibility. To the contrary, the instruction told the jury that "one of the issues in this case is whether the use of force by [Defendant] against *Marion Ray* was in self defense." (emphasis supplied). Continuing, the jury was instructed on the law as follows: "In order for a person lawfully to use force in self-defense, he must reasonably believe he is in imminent danger of harm from the other person." In pertinent part, the instruction continued:

"[I]f the defendant reasonably believed he was in imminent danger of harm from the acts of *Marion Ray* and he used only such non-deadly force as reasonably appeared to him to be necessary to defend himself, then he acted in lawful self-defense, or if the defendant reasonably believed he was in imminent danger of death or serious physical injury from the acts of *Marion Ray* and he reasonably believed that the use of deadly force was necessary to defend himself, then his use of deadly force

was in lawful self-defense." (emphasis supplied).

Defendant testified that he never saw Marion Ray as a threat and no other evidence exists to contradict Defendant's testimony on this subject. Consequently, the instruction was the functional equivalent of no self-defense instruction at all.

Under the circumstances, the jury may have been misled when the MAI–CR3d 306.06 instruction was given without modification and with the bystander/victim's name inserted therein, rather than that of the aggressor. In reaching this result, we have considered the possibility that Defendant would not be prejudiced if his claim of self-defense was inconsistent with a second-degree assault submission. However, as we now explain, there is no inconsistency in these two theories under the circumstances.

■ Though a defendant may forcibly repel and inflict injury to repel an aggressor under certain circumstances, the State may still advance the claim that a defendant was reckless with respect to bystanders. *Fielder,* 50 S.W.2d at 1034. This principle is explained in *State v. Isreal,* 872 S.W.2d 647 (Mo.App.1994):

"'If . . . the perpetrator of the homicide or of the assault had no criminal intent in attempting to injure or kill another person, as where the perpetrator was lawfully defending himself from the harm sought to be inflicted upon him by such other person, the fact that, on that occasion, a third person was unintentionally injured or killed by the perpetrator would not make him liable, unless the perpetrator acted carelessly or without regard to the safety of innocent bystanders.'"

*Id.* at 650 n. 4 (quoting Annot., Self-defense—Unintended Injury or Death, 55 A.L.R.3d 620, 622–23 (1974)).

Although the State contended to the trial court that "[a] claim by [Defendant] . . . that the shooting was reckless does not support the submission of self-defense," it has not advanced that argument before this court. Nor would we have been persuaded by such argument had it been made.

■ First, Missouri case law recognizes that a claim of self-defense and a charge that defendant acted recklessly are not always inconsistent. In *Isreal*, the defendant asserted that he was shooting at one individual who had a knife, but that he had covered his eyes and fired all the rounds from his gun. The defendant killed a bystander and was convicted of second-degree murder. The *Isreal* court found reversible error in the trial court's failure to submit involuntary manslaughter as a lesser included offense. 872 S.W.2d at 650[2]. Thus, *Isreal* recognized that the accused was entitled to jury instructions on both involuntary manslaughter and self-defense. *Id.*

■ Second, Defendant was entitled to have the jury know of his claim of justification for firing the rifle as it deliberated on whether Defendant acted recklessly in shooting Marion Ray. A person acts "recklessly" when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care *which a reasonable person would exercise in the situation.*"[2] (emphasis supplied). § 562.016.4.

Clearly, Defendant acted intentionally when he first tried (albeit unsuccessfully) to fire the rifle, then loaded it, and finally fired the gun in the direction of "the people who were shooting at [him]." Yet, Defendant's reason for acting intentionally was part of *"the situation"* that the jury should have been permitted to consider. Defendant's claim of justification for shooting at Ron Faulkner was part of the total circumstances to be weighed in deciding if Defendant grossly deviated from the applicable standard of care. Defendant was entitled to have the jury correctly instructed on that issue. Without a proper instruction on self-defense, the jury "may have been adversely influ-

enced. ...." *See Rodgers,* 641 S.W.2d at 85[5].

■ We hold that Defendant was entitled to the self-defense instruction in connection with the second-degree assault verdict director. We also find that the self-defense instruction given was prejudicially erroneous.

We do not ignore the State's claim that the trial court was bound to give the pattern instruction without modification because MAI–CR3d 306.06 "specifically indicates that the victim's name is to be used in the instruction." However, it is an argument that disregards *State v. Carson,* 941 S.W.2d 518 (Mo. banc 1997).

"MAI–CR and its Notes on Use are 'not binding' to the extent they conflict with the substantive law. 'Procedural rules adopted by MAI cannot change the substantive law and must therefore be interpreted in the light of existing statutory and case law.'

. . . .

"If an instruction following MAI–CR3d conflicts with the substantive law, any court should decline to follow MAI–CR3d or its Notes on Use." (citations omitted). *Id.* at 520.

■ As stated, reversible error resulted when the pattern instruction MAI–CR3d 306.06 was used with the victim's name inserted. Even so, we caution that Defendant's proposed modification of MAI–CR3d 306.06, without more, would not have correctly instructed the jury. When evidence in a bystander case compels a self-defense submission, the jury must still be instructed that a finding of justification for use of force against the aggressor does not provide a legitimate ground for reckless conduct toward a bystander. Accordingly, the MAI–CR3d instructions must be modified to appropriately submit the reckless use of force even if the jury finds that Defendant was justified in defending against Ron Faulkner.[3]

---

2. Inexplicably, this definition of "recklessly" was omitted from the instructions given this jury. This omission occurred even though MAI–CR3d 319.12, Notes on Use 7(a) mandates inclusion of the definition. As a result, this jury was left without any guideline as to what the term "recklessly" meant. However, it was an instructional error about which Defendant never complained.

3. We are mindful that the litigants and the trial court may want more exact direction on how to modify the MAI–CR3d instructions. However, we cannot speculate on what the evidence may be on retrial, especially in light of the disparate facts that already exist.

■ Reversal of the second-degree assault charge compels reversal of Defendant's conviction for armed criminal action. This follows because the armed criminal action was dependent upon the jury finding that Defendant committed second-degree assault. *See State v. Weems,* 840 S.W.2d 222, 228 (Mo.banc 1992). "A conviction for armed criminal action requires the commission of an underlying felony." *Id.*

The judgment is reversed. The cause is remanded for a new trial.

PARRISH, P.J., and BARNEY, J., concur.