**STATE of Missouri, Respondent,**

v.

**Randy E. WILLIAMS, Appellant.**

**No. SD 31956.**

Missouri Court of Appeals,
Southern District,
Division One.

July 18, 2013.

Rosalynn Koch, of Columbia, MO, for Appellant.

Chris Koster, Attorney General and Andrew C. Hooper, Assistant Attorney General, of Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., C.J.

Randy E. Williams ("Williams") appeals his convictions for first-degree domestic assault, attempted kidnapping, and second-degree robbery. Following a bench trial, Williams was sentenced by the trial court to seven years' imprisonment in the Missouri Department of Corrections on each count, with each count to run concurrent

with "each other and any other." This appeal followed. We affirm the trial court's judgment.

## Factual and Procedural Background

Viewing the evidence in a light most favorable to the verdict, *State v. Neal,* 328 S.W.3d 374, 379 (Mo.App.W.D.2010), the record reveals that at approximately 1:00 a.m. on May 17, 2007, victim was attacked and robbed by Williams while walking to her car after finishing her shift as a dancer at a local nightclub in Springfield.

On August 13, 2009, Williams was charged by information with the class A felony of first-degree domestic assault— serious physical injury (Count I), pursuant to section 565.072; the class C felony of attempted kidnapping—inflicting injury/terrorizing (Count II), pursuant to section 565.110; and the class A felony of first-degree robbery (Count III), pursuant to section 569.020.[1]

On July 13, 2010, Williams waived his right to trial by jury in open court and was questioned by the court as to his understanding of the right he was waiving. Williams stated he was aware of his rights, no one had pressured him in making this decision, and he wished to proceed with a bench trial. The court found that Williams had "freely, voluntarily, and intelligently waived his right to trial by jury."

A bench trial was held on May 5, 2011. Victim was present and testified to the events which took place on May 17, 2007. Victim testified she had been in a "relationship" with Williams in 2004. Victim believed at one point Williams was the father of her child and had served him with a petition for child support on May 17, 2007.[2] Victim indicated she had spoken with child support enforcement and was told Williams had been served with the paperwork on May 17 at his place of employment.

Victim testified that on the evening of May 17, she saw Williams coming from the right side of the building as she was leaving the club for the night with a friend and stepped out into the parking lot. Williams looked "a little sweaty, hair was like sticking out everywhere, eyes was [sic] moving back side to side, like nervous, like he was going to do something[.]" Victim was three to four feet away from the building at that time. After seeing Williams, victim turned to her left to ask her friend to go get help, and Williams hit her on the right side of her face with his fist. Victim testified she "blacked out" and remembered coming to in the middle of the parking lot, then ten to fifteen feet away from the club.

Victim testified that when she regained consciousness, Williams had his left hand wrapped up in her hair and his "other one was punching me and pulling hair out." Victim's right upper tooth had come through her lip and her hair was "all over the ground of the parking lot[.]" Williams was cursing at her and told her that "God had told him to punish her." Williams then dragged her by her hair another five feet to her car. Williams had taken her keys from her hand and when his first attempt to unlock the car failed, he slammed victim up against her car leaving blood on the car. Victim did not recall how many times Williams struck her, but "[i]t was a lot." She kept begging Williams to stop. Victim finally "twirled around" Williams and was able to get away, but not without pulling the hair out

---

1. All statutory references are to RSMo 2000.

2. On cross-examination, victim testified she no longer believed Williams was the father of her child and had dismissed her "child support case" because "that's the night he beat me." No DNA testing was done.

Williams still had wrapped around his left hand.

Victim testified that when she exited the club, she had with her "a little red bag" that she kept her shoes and dance clothes in and also a "Crown Royal" bag that had money in it. When victim regained consciousness, the bag was not in her hand. After Williams first hit her, up until the time she managed to run back into the club, she lost track of the bag she was carrying. Victim testified Williams "had the keys and stuff" when she regained consciousness.

After victim was able to break free from Williams, she ran back to the club where the bartender took her to the bathroom and cleaned her up. Victim's "right lip was tore up pretty good, ... [she] had a hole up above it where the tooth came through, and there was a lot of swelling." Victim's eye was also swollen shut.

Victim sought treatment in the emergency room at St. John's hospital. Williams had caused a puncture to the right side of victim's lip, a large bruise under her right eye, and a right maxillary sinus fracture. A tooth had been knocked loose and was eventually pulled.

Victim testified she still had a scar above her lip and one on the inner lip, continuing fluid buildup on the right side of her face in the sinus cavity causing her eye to turn black at times, and had four infections in her sinus cavity. After the assault, Victim had trouble eating and speaking for several weeks. It took months for the hair Williams pulled out to grow back.

Victim testified she returned to work at the club about a month after the assault. Several days after she returned, Williams came to the club, opened the front door, and told her that "it wasn't the end." Williams had "a crazy look on his face."

Cody Willis ("Willis"), a bouncer at the club, testified that on the evening of the assault, he saw victim come back into the club and "she had been assaulted." She was "crying and bleeding from her mouth[,]" and there was a lot of blood, enough that it "startle[d]" him. Victim was screaming for someone to call police. Willis went out to the parking lot and saw two men—one he recognized as a customer and the other, who was holding a bag and a pair of shoes, began running away. Willis identified Williams in the courtroom as the man he saw running away and who he later apprehended.

Willis, another customer, and a neighborhood kid chased the man and eventually were able to tackle him and hold him down.[3] The neighborhood kid did not want to stay and talk to the police so he was given victim's bag and asked to return it to the bar, which apparently "didn't all make it back to the bar[.]" The police arrived and took custody of Williams.

Jeffrey Longman ("Longman"), an officer with the Springfield Police Department, was on patrol the evening of the assault. He was called to the club to investigate an assault. Longman met with victim and observed her right cheek appeared swollen and there was a cut on the right side of her lip.[4] Victim had blood "smeared on her face[,]" blood coming from her lip, and the white cloth she was holding against her face had "quite a bit of

---

**3.** Willis testified that he never struck or kicked Williams.

**4.** Longman had several years of training in domestic assaults and had experience in what

kinds of injuries were typically found on an assailant as opposed to injuries found on a victim.

blood on it." He testified photographs were taken of victim's injuries at the hospital where she then exhibited swelling and a black eye.

Longman spoke with victim who was very upset and had trouble speaking. Based on his training and experience in domestic assault, victim's injuries were consistent with her account of what happened. As part of his investigation, Longman also spoke with witnesses Susan Davis, Shirden Loving, and Willis.

After Williams was arrested and returned to the club, Longman read Williams his rights and Williams agreed to speak with him. Williams told Longman he had gone to the club to speak to victim, saw victim exit the club, she appeared intoxicated, and she stumbled to the ground. Williams then went to help victim, lifted her up, and she started screaming and ran back into the club. At that point, people began running out of the club toward Williams and he ran because he thought they were going to attack him and he was in fear for his safety. Longman testified that victim's injuries were not consistent with someone who "just falls down," and there was nothing about victim which indicated to him she was intoxicated.

Longman testified Williams was then transported to jail. Longman observed at the jail that Williams had blood on both of his hands and on the left hand, had a cut on his knuckles. Photographs were taken of Williams' injuries and it was Longman's opinion the injuries appeared to be fresh. Williams told Longman he received the injuries to his hand during the encounter with Willis. Longman saw no other injuries to Williams that would be consistent with being kicked and punched multiple times by multiple men and based on his training and experience, the injuries to Williams' hands appeared to be offensive.

Janet Jordan ("Dr. Jordan"),[5] an emergency physician at St. John's hospital, who treated victim, testified that most of victim's injuries appeared to be about her face and head. Victim had a contusion on the left side of her scalp, a puncture to the right side of her upper lip, and a large contusion under her right eye. A CAT scan of victim's face revealed a right maxillary sinus fracture, and a probable fracture of the anterior wall of the maxillary sinus.[6] Dr. Jordan testified that with fractures of this nature, there is risk of contamination that can go into the bone, eye, brain, and other vital structures around the sinus. It can also affect the positioning of the eyeball. The puncture wound to victim's lip was made by one of her own teeth. Dr. Jordan testified that victim's injuries were consistent with victim's accounting of the assault—victim's injuries could not have been caused by falling down.

At trial, victim admitted she had one drink that evening. Dr. Jordan testified that while the admitting nurse noted victim had "alcohol on her breath," Dr. Jordan did not state that in her notes and she would have if she thought victim was intoxicated. Victim also had normal neurological findings which would not indicate intoxication.

In closing argument, defense counsel argued that victim's trial testimony was inconsistent with her deposition testimony. Defense counsel stated there was testimony that there were "other individuals that were present" but that "[n]one of those witnesses were here to testify today." In rebuttal, the State responded that "[i]t's also been mentioned that we didn't have

---

5. Dr. Jordan had been an emergency room physician for over twenty years.

6. The anterior maxillary sinus makes up part of the orbital floor where the eyeball sits.

other witnesses that were actually outside, that observed this happening. The friend of hers that was next to her, Shirden Loving, is actually now deceased, so he cannot—he could not have been here to testify."

The trial court took the case under advisement and later found Williams guilty of second-degree domestic assault, attempted kidnapping, and second-degree robbery. Although the sentencing assessment report recommended probation, the trial court found that Williams' inability and refusal to take any responsibility for the assault or robbery, his demeanor throughout trial and sentencing, and his problems with his probation officer, made it clear he was not a candidate for probation. The trial court sentenced Williams as set out above.

In his first point, Williams asserts the trial court erred in convicting him of the charged offenses because there was insufficient evidence to prove he " 'forcibly stole' the keys and bag" from victim, no evidence he used any force " 'in the course of" or " 'for the purpose of" taking those items, and no evidence he assaulted or injured victim in order to take the property. In his second point, Williams asserts the trial court erred in permitting the State to argue that victim had no witnesses to the incident as her "companion" that evening was deceased, therefore depriving Williams of the "adverse inference to be drawn from the [companion]'s failure to testify."

The issues for our determination are:

1. Was the evidence sufficient to prove that Williams committed the crime of second-degree robbery.

2. Whether the trial court plainly erred in permitting the State to argue in closing argument that a witness did not testify because he was deceased.

### Point I: Sufficient Evidence Supported Second–Degree Robbery Conviction

First we address William's sufficiency-of-the-evidence argument. Williams claims there was no evidence that he " 'forcibly stole' " any property from victim as required under section 569.030.1 for second-degree robbery because there was: (1) no force " 'in the course' " of stealing, and (2) no force " 'for the purpose of" stealing as defined by section 569.010.1.

### Standard of Review

■ "In reviewing the sufficiency of evidence in a court-tried criminal case, the standard of review is the same as in a jury-tried case. This Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt." *State v. Breedlove*, 348 S.W.3d 810, 814 (Mo.App.S.D.2011) (internal quotations and citations omitted). The function of this Court is to determine if the conviction is supported by sufficient evidence. *Id.* The evidence, together with all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the verdict, disregarding any evidence and inferences to the contrary. *State v. Biggs*, 333 S.W.3d 472, 480 (Mo. banc 2011). "Even if the evidence would support two equally valid inferences, only the inference that supports the finding of guilt can be considered." *State v. Latall*, 271 S.W.3d 561, 568 (Mo. banc 2008). "Great deference is given to the trier of fact." *State v. Durant*, 156 S.W.3d 524, 527 (Mo. App.W.D.2005). "The reliability, credibility, and weight of witness testimony are for the fact-finder to determine[, and i]t is within the fact-finder's province to believe all, some, or none of the witness's testimony in arriving at its decision." *State v. Harrell*, 367 S.W.3d 122, 126 (Mo.App.S.D. 2012) (internal citation omitted).

## Analysis

Section 569.030.1 provides that a person commits the crime of robbery in the second degree when he forcibly steals property. The legislature has defined "forcibly steals" as used in Chapter 569 as follows:

[A] person 'forcibly steals', and thereby commits robbery, when, in the course of stealing . . . uses or threatens the immediate use of physical force upon another person for the purpose of:

(a) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or

(b) Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft[.]

§ 569.010.1.

■ Williams argues there was no evidence that he "had any intent to steal [victim's] property when he was using force against her, or that that [sic] was his purpose in doing so." Williams' argument misinterprets the nature of events that Missouri courts can consider when determining whether the elements of second-degree robbery have been satisfied. "As used in the context of forcible stealing, 'in the course of is a broad term, covering the whole transaction." *State v. Weems*, 840 S.W.2d 222, 228 (Mo. banc 1992). It is *enough* that the violence to victim was preceded by or contemporaneous with the taking of property. *State v. Rhodes*, 988 S.W.2d 521, 526 (Mo. banc 1999).

■ Here, when looking at the entire course of events, it is clear that Williams used physical force " 'in the course' " of stealing. When victim exited the club that night, she had a bag with money in it with her. When victim saw Williams in the parking lot of the club, he immediately hit her on the right side of her face with his fist causing her to black out. When victim came to, she was in the middle of the parking lot, then ten to fifteen feet away from the club, and the bag with her money was not in her hands. Williams continued using physical force on victim by punching her, pulling her hair out, and dragging her by her hair another five feet to her car. Williams had also taken her car keys from her hand and he was trying to unlock the car while slamming victim up against her car leaving blood on the car. Williams kept hitting victim until she was able to get away.

■ Likewise, it is clear that Williams used physical force " 'for the purpose of' " taking victim's keys and bag. Williams contends "there was no evidence that [Williams] assaulted [victim] in order to steal the bag of shoes and dance clothes from her[,]" or evidence that Williams attacked victim with the intent to steal victim's property. Williams argues the evidence provided a motive for physical force used on victim, but not stealing her property.

■ Intent can be established by circumstantial evidence or inferred from surrounding facts. *Durant*, 156 S.W.3d at 527. The necessary intent in this case could have been formed before or even during the incident. *Weems*, 840 S.W.2d at 228. Based on the evidence, the trier of fact could have inferred the formation of Williams' intent to take victim's property occurred either before or even during the incident. After Williams punched victim causing her to black out, which clearly is physical force, he took victim's belongings and continued to use physical force on victim. Such conduct indicates Williams could have formed an intent to take victim's property either before or even during the incident.

■ Even if the evidence would support two equally valid inferences, only the inference that supports the finding of guilt can be considered. *State v. Chaney*, 967 S.W.2d 47, 54 (Mo. banc 1998). But here, *either* version is sufficient evidence that Williams used physical force for the purpose of stealing because violence to a victim preceded by or contemporaneous with the taking of property, is enough to find Williams formed the requisite intent to rob victim. *Rhodes*, 988 S.W.2d at 526. Here, Williams used physical force before and during the taking of victim's property, both of which establish an intent to use physical force for the purpose of stealing.

A reasonable trier of fact could find sufficient evidence of physical force while " 'in the course of' " and " 'for the purpose of' " stealing from the fact that Williams took victim's bag, money and keys, all while punching, hitting, and dragging victim across the parking lot, and pulling out her hair. As such, we find sufficient evidence supported Williams' second-degree robbery conviction. Point I is denied.

### Point II: No Plain Error in Permitting Unobjected Closing Argument at Trial

In his second point, Williams argues the trial court "plainly erred in permitting the [S]tate to argue a fact not in evidence, [during closing], that [a witness] did not testify because he was deceased." During closing argument, defense counsel argued that victim's trial testimony was inconsistent with her deposition testimony, and in support, pointed to victim's testimony that there were "other individuals present" but that none of those witnesses testified at trial. In rebuttal, the State responded that victim's friend that was next to her on the night of the incident is now deceased, so he could not have been present at trial

to testify. Williams argues this deprived him of the opportunity to argue an adverse inference from the absence of a witness who was not equally available to him.

### Standard of Review

■ Williams acknowledges he did not preserve his second point for appellate review, and that his second point is entitled to review only for plain error. *See State v. Vanlue*, 216 S.W.3d 729, 733 (Mo. App.S.D.2007) (applying plain-error review to an unpreserved claim that the trial court erred in failing to *sua sponte* intervene in closing argument to prevent a retaliatory argument by the State). Rule 30.20 [7] provides in part that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain errors are evident, obvious, and clear, and a reviewing court determines whether such errors exist based on the facts and circumstances of each case. *State v. Royer*, 322 S.W.3d 603, 606 (Mo. App.S.D.2010).

■ In conducting plain-error review, we first determine whether the trial court committed an evident, obvious, and clear error that affected appellant's substantial rights. *State v. Russell*, 336 S.W.3d 504, 506 (Mo.App.S.D.2011). "Only if this Court identifies plain error do we proceed to the second step of determining whether manifest injustice or a miscarriage of justice resulted." *Id.* Williams has the burden to establish the trial court committed plain error, and that there has been a manifest injustice or miscarriage of justice. *Royer*, 322 S.W.3d at 606.

### Analysis

■ In *State v. McMillin*, 783 S.W.2d 82 (Mo. banc 1990), our supreme court

---

**7.** All rule references are to Missouri Court Rules (2013).

expressly refused to review claims regarding closing arguments finding, "[t]he plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review." *Id.* at 98 (internal quotation and citations omitted). *See also State v. Altaffer,* 23 S.W.3d 891, 896 (Mo. App.S.D.2000) (expressly refusing to review under the plain-error rule defendant's complaints about prosecutor's closing argument because defendant failed to preserve the alleged error). A review of Missouri case law makes it clear that plain error will rarely be found in unobjected closing argument. *Vanlue,* 216 S.W.3d at 734.

> " 'Appellate courts are wary of claims that a trial court erred in failing to ... *sua sponte* [make objections and rulings] in [closing argument of] a criminal case.' " *State v. Taylor,* 166 S.W.3d 599, 608 (Mo.App.2005) (quoting *State v. Derrick,* 965 S.W.2d 418, 419 n. 1 (Mo.App. 1998)) (emphasis added). " 'To convict a trial court of an error, not put forth by the defendant ... allows an accused to stand mute when incidents unfavorable to him or her occur during trial, gamble on the verdict, and then seek favorable results on appeal.' " *Taylor,* 166 S.W.3d at 608 (quoting *State v. Tilley,* 104 S.W.3d 814, 819 (Mo.App.2003)). Additionally, "review for plain error of a trial court's failure to *sua sponte* [take action in closing argument] is extremely limited." *State v. Collins,* 150 S.W.3d 340, 349 (Mo.App.2004).

*Id.* at 733.

■ "Further, when complained of remarks come in the rebuttal portion of argument by the [S]tate, the trial court may consider whether the comments were invited. The [S]tate may go further by way of retaliation in answering the argument of the defendant than would be normally allowed." *State v. Pratt,* 858 S.W.2d 291, 292 (Mo.App.E.D.1993) (internal citation omitted). *See also State v. Sanchez,* 186 S.W.3d 260, 265 (Mo. banc 2006) (holding the State "has considerable leeway to make retaliatory arguments at closing[,]" and it "may retaliate to an issue raised by the defense even if the [State's] comment would be improper.").

■ Here, the State's remark was invited by Williams' suggestion that victim's testimony was inconsistent because no witnesses to the incident testified although there was testimony that other individuals were present. This argument created an improper presumption that the State was failing to produce a witness to the trial court when in fact, the witness was deceased and could not testify. The State answered in retaliation to Williams' argument by explaining why the witness was not present at trial. "A prosecutor may retaliate to an issue raised by the defense even if the prosecutor's comment would be improper." *Sanchez,* 186 S.W.3d at 265.

■ Finally, Williams has failed to meet his burden of showing how the State's comment had any decisive effect on the trier of fact. " 'In a jury-waived case a certain amount of latitude in the admission of evidence is allowed, and even where an error is made in the admission of some evidence, ... such error is ordinarily held to be non-prejudicial.' " *State v. Sladek,* 835 S.W.2d 308, 313 (Mo. banc 1992) (quoting *State v. Leigh,* 580 S.W.2d 536, 545 (Mo.App.E.D.1979)).

■ Plain-error review should rarely be granted, and the instant case does not constitute one of those rare occasions on which such review is appropriate. We find no error that is evident, obvious, and clear, nor do we find error that facially establishes substantial grounds for believing that manifest injustice has resulted.

Therefore, we decline to exercise our discretion to review for plain error. *See State v. Hughes*, 944 S.W.2d 247, 248 (Mo. App.W.D.1997).

Accordingly, we find the trial court did not plainly error in permitting the State to argue in closing argument that a witness did not testify because he was deceased. Point II is denied.

The judgment of the trial court is affirmed.

NANCY STEFFEN RAHMEYER, P.J., and DANIEL E. SCOTT, J., Concurs.